Madden, Judge,
delivered the opinion of the court:
Plaintiff was the successful bidder for a contract to construct for the defendant in the District of Columbia a complete steam generating plant to be known as the Central Heating Plant for Public Buildings. The contract was made on December 21, 1932. The contract price was $1,489,900.
This suit relates to the electrical wiring installed by plaintiff under the contract. Plaintiff has been paid the full contract price for the job as a whole, but claims $18,-391.04 as extra compensation because of a change made in the specifications for wiring after the contract had been *136 made. The circumstances of the change were as follows. Article 1557 of the Specifications which was in that part of the Specifications relating to electrical work as a whole provided:
1557. Standards. — In the furnishing and installing of all electrical work, the contractor shall comply strictly with the latest edition of the National Electrical Code of the National Board of Fire Underwriters for Electric Wiring and Apparatus. He shall also comply with the latest standards of the American Institute of Electrical Engineers wherever applicable.
Article 1713, which relates specifically to the electric wires and cables to be used, provided:
1713. Wires and cables. — All wires and cable, whether braided or lead-covered, except “Parkway” cable, wires for the pressure indicating circuits, and signal systems, shall be of the flame-proof type, built to meet the “Navy Department Specification” No. 15C1G, dated May 1, 1931, which may be obtained from the Bureau of Supplies and Accounts, Navy Department, Washington, D. C.
In March 1933, the supervising engineers for the Government wrote plaintiff asking how much of a deduction would be allowed if a proposed accompanying revision of paragraph 1713 were followed which reduced the thickness of the layers of insulation on the wires. Plaintiff’s proposal in response was that there should be an addition to the original price of $11,797.50. In August 1933, the defendant wrote plaintiff, referring to the fact that there had been much correspondence and many conferences about the question in the meantime, stating that the conduits specified were not large enough to contain the thickly insulated wire specified, and ordering plaintiff to proceed with the installation according to the March proposed revision of article 1713 “subject to subsequent adjustment of contract price, which it is evident should be a reduction instead of an addition.” Plaintiff thereupon proceeded to install the wiring as directed and to complete the contract otherwise. The defendant paid the unpaid balance of the contract price, which plaintiff received on the understanding that it did not waive its rights to make further claims under the contract.
*137 Since the 1933 revision of the wiring specifications reduced the thicknesses of the layers of insulation on the wires, the defendant’s assertion in its August 1933 letter that the price should be revised downward would seem to be well founded. But plaintiff claims the price should be increased, and is suing here for that increase. It says that the specifications, before the 1933 revision, were ambiguous; that they required that the installation be in compliance with the National Electrical Code as well as with the Navy Department Specification 15C1G; that the Navy specifications related to wire, the diameter of the conductor or metal core of which was measured in thousandths of inches, which even when translated into units of circular mills were not equivalent to the gauges expressly stated in the specifications; that the flame-proof type of insulation required by article 1713 and by the Navy specifications for insulation were not sanctioned by the Code for installations requiring moisture-proof insulation; that plaintiff’s subcontractor for all the electrical work, in making up its estimate for its bid on the contract, intended to resolve the ambiguity by using the sizes of metal conductors set out in the specifications, covered with insulation approved by the National Electrical Code, viz, rubber insulation; that such wiring would have cost only $6,229.41, whereas the wiring actually installed under the revised specifications was worth, as the defendant concedes, $21,428.62; that plaintiff should therefore recover the difference, or $13,199.21. Plaintiff also claims the right to add 10% for profit and 10% for overhead, making a total of $18,391.04.
It is stipulated by the parties that plaintiff’s subcontractor did make its estimate on the basis described above. Our question is whether it was justified in so doing so as to entitle plaintiff to extra compensation for finally making a more expensive installation. As we have said, the National Electrical Code requirement was given in a part of the specifications relating generally to all the electrical material and work of the contract. Article 1713, on the other hand, related specifically to the wiring; it said expressly that the insulation should be flame-proof, which rubber insulation is not; it said the insulated wire must be “built to meet the *138 ‘Navy Department Specification’ No. 15C1G, dated May 1, 1931, which may be obtained from the Bureau of Supplies and Accounts, Navy Department, Washington, D. C.”. The Navy specification of asbestos and varnished cambric is plain.
On these specifications, plaintiff and its subcontractor had no right to disregard the plain specification of flame-proof insulation to be built up in a specified way of specified materials, and submit its bid on the basis of a different and cheaper insulation. The specifications were carelessly written, but that did not license plaintiff to disregard those portions of them that were plain. If it had occurred to plaintiff when making up its bid that there was an inconsistency between the general requirement that all the electrical installation should conform to the National Electrical Code, and the particular requirement that the insulation be flame-proof and of a particular type, it should have done what the invitation for bids provided, make a request for an interpretation addressed to the supervising architect. This should also have been its procedure if it was troubled by the fact that, as it claims, the Navy specifications for insulation were in violation of an applicable Regulation issued under the District of Columbia Code. We do not decide whether or not the Code was applicable. If an owner invites bids for an illegal installation, the bidder is not privileged to submit a bid and if it is accepted, claim that he has a contract for a much cheaper lawful installation. In any event the claim of illegality seems to be an afterthought as the revised specifications under which plaintiff made the installation without raising any question of illegality, were also in violation of law if the original Navy specifications were.
Plaintiff says that even if it should have estimated its bid on the basis of the Navy specification of flame-proof insulation, it should have counted only on using the type and thickness of insulation called for by Navy specification SFPC 3, which was asbestos with no varnished cambric, and which while more expensive than rubber, was considerably cheaper than that called for by Navy specification SFPC 4-1, which required two layers of asbestos and a layer of var *139 nished cambric between them, and was a thicker cable. The specifications required insulation sufficient for 600 volts on all wires carrying any load less than 600 volts. The defendant’s expert testified that wires insulated according to SFPC 3, installed as these were to be installed, were not adequate for 600 volts. Plaintiff’s experts testified that they would carry 600 volts, but upon cross-examination said they would not advise their use for so heavy a load. In view of the fact that the specifications were carelessly drawn, and that a choice was to be made which plaintiff might, not altogether without reason, have made as it contends, we resolve the ambiguity in the specification in plaintiff’s favor and treat it as if it had bid on SFPC 3 for the wires carrying no more than 600 volts. As to those carrying more than 600 volts, the Navy specifications gave no exact directions. Plaintiff should, however, have counted on their being “flame-proof” and on using the cambric and asbestos insulation called for by the Navy specification, and on their being built up to good manufacturing standards as any manufacturer would have known how to do, given the size of the metal conductor, the voltage to be carried, and the insulating material to be used.
The actual installation made under the revised specification used the type of asbestos and varnished cambric insulation called for in SFPC 4-7, but with thicknesses of insulation reduced so that the wires would go into the conduits. This made the wires carrying less than 600 volts more expensive than SFPC 3 wires would have been. The wires carrying more than 600 volts, as actually installed, were probably less expensive than the ones that should have been estimated for, since the thickness of the insulation was reduced.
The fact that the Navy specifications, as we are asked by the defendant to interpret them, called for insulation so thick that wires thus insulated could not be drawn through the already installed conduits seems to have had nothing to do with the amount of plaintiff’s bid. There is no proof that plaintiff was aware of this fact when it made its bid. If it had been so aware, it would still not have been privileged to substitute another type of insulation, not only thinner, but of a wholly different and cheaper material.
*140 We conclude, therefore, that plaintiff’s bid, on the basis of rubber insulation, may not be used in determining whether and how much the revised specifications increased the cost of plaintiff’s performance. We have stated above what should have been the basis of plaintiff’s bid. On that basis its performance would have cost $16,646.69. Its actual performance under the revised specifications cost $21,428.62. It is entitled to recover the difference of $4,181.93, together with an allowance of $418.20 for overhead and a profit of ten percent, or $526.01, on the sum of excess cost and overhead. This makes a total of $5,786.14 and judgment will be entered for plaintiff in that amount.
It is so ordered.
Jones, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.