**J. A. JONES CONSTRUCTION COMPANY**

v.

**The UNITED STATES.**

No. 71–62.

United States Court of Claims.

May 10, 1968.

Claude Monnet, Oklahoma City, Okl., attorney of record for plaintiff.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge*

The plaintiff seeks review of an adverse decision of the Armed Services Board of Contract Appeals (hereinafter called ASBCA or the Board), Appeal of J. A. Jones Construction Company, ASBCA No. 5798 (December 27, 1961), 61–2 BCA para. 3256, which modified in part a previous adverse decision of the Corps of Engineers Board of Contract Appeals, Appeal of J. A. Jones Construc-

tion Company, Eng. Dec. No. 1425 (June 4, 1959). The defendant, though agreeing with that part of the Board decision rejecting the bulk of the plaintiff's claim, contended the partial recovery allowed plaintiff by the Board was not supported by substantial evidence. The Board was right and we affirm.

Part of a large contract awarded plaintiff in 1954 by the Corps of Engineers for constructing facilities at the Ernest Harmon Air Force Base in Newfoundland, Canada, involved, for purposes of this suit, the completion and/or construction for the Air Force of five multi-purpose hangars with shells (roofs, siding, and sliding doors) of galvanized iron sheeting of prescribed gages (see Paragraph 14–04 of the technical provisions, infra). J. A. Jones subcontracted this phase to Capitol Steel & Iron Company, the beneficial claimant suffering the loss in suit, and all but the furnishing of the sheeting was sub-subcontracted in turn to the Western Steel Erection Company. "Plaintiff" shall refer to any or all of the trio, unless specified.

Paragraph 14–04 of the technical specifications for roofing and siding provided:

GALVANIZED SHEETS shall be the manufacturer's standard commercial type, having corrugations approximately 2½ inches wide, and shall be tight-galvanized with *not less than* ¾ ounce zinc coating per square foot on *each* side of sheet. Sheets shall be of plain open-hearth *20 gage* for roofing and *24 gage* for siding. All interior corrugated metal work shall be galvanized sheets. (Emphasis supplied)

\* \* \* \* \* \*

The principal issue of law relates to the requirement of ¾ ounce coating "on each side" in light of paragraph 14–02 of the technical provisions of the specifications which listed a series of specifications generally applicable to roofing and siding metal, and included Federal Spec-

* The court is indebted to Trial Commissioner C. Murray Bernhardt from whose opinion we have borrowed in part, although we direct a somewhat different disposition. The facts are set forth in our opinion.

ification QQ–I–716, Iron and Steel, Sheet, Zinc Coated, Galvanized. This specification set forth, in tables contained therein, as a requirement for compliance with the provisions thereof, the *nominal* weight of zinc coating for 20 and 24 gage galvanized sheets. It provided:

| | Class A (oz. per sq. ft.) | Class B (oz. per sq. ft.) | Class C (oz. per sq. ft.) |
|---|---|---|---|
| 20 gage | 2.75 | 2.50 | 1.75 |
| 24 gage | | 2.50 | 1.50 |

It also set forth as the *minimum* weight of zinc coating for compliance with the provisions of QQ–I–716 the following:

| Nominal weight (oz. per sq. ft.) | Minimum weight as disclosed by | |
|---|---|---|
| | Sheet weight test (oz. per sq. ft.) | Diagonal triple spot test (oz. per sq. ft.) |
| 2.75 | 2.45 | 2.30 |
| 2.50 | 2.20 | 2.00 |
| 2.00 | 1.80 | 1.60 |
| 1.75 | 1.55 | 1.35 |
| 1.50 | 1.30 | 1.15 |

The weights set forth in this specification are total weights, that is, the total weight of the zinc coating applied to each side of a square foot of a galvanized sheet.

Reading the tables together, one can see, for example, that where 20-gage, Class C sheeting is required by the contract, the nominal weight of zinc coating specified in the first table is 1.75 oz. per sq. ft. The corresponding nominal weight figure in the second table would show the contractor that for the coated sheets to be acceptable, the minimum oz. per sq. ft. weight of the coating would have to be 1.55 under the sheet weight test and 1.35 under the diagonal triple spot test. Testimony showed that the manufacturing industry uniformly employed the diagonal triple spot test in testing for compliance with the specification.

Since at least 1942, specification QQ–I–716, which with interim amendments is the Government counterpart of and closely resembles the industry standard specification A–90–39 of the American Society of Testing Materials, has been the basic specification governing all military contracts involving galvanized steel sheeting. Capitol Steel & Iron Company say they have constructed more galva-

nized steel hangar buildings for the Corps of Engineers than any other contractor in the United States and have always operated under specification QQ–I–716, having never before encountered the equivalent of paragraph 14–04, quoted supra. Specification QQ–I–716 also prescribed testing methods for determining the weight of zinc coating.

The Army Engineers drafted the language of paragraph 14–04 and promulgated it as a "guide specification" to be copied into contracts by field officials. Though details are vague, it is said to have been used in several other contracts. Except as disclosed in the language itself, the purpose of the paragraph does not appear in the record. It was not, as might have been supposed, connected with any peculiarities of the Newfoundland climate.

Witnesses for plaintiff, representatives of major steel companies, said their concerns would have refused to bid on a contract incorporating paragraph 14–04 for several reasons: the absence of a prescribed testing method, the alleged difficulty of measuring weight of coating if it is not a total for both sides, and the requirement for a "tight" coat, i. e., one that will not flake if the metal is bent, associated with a coating thick-

ness making such tightness difficult. However, they also said that in 1954 a reasonable contractor would have construed 14–04, despite its literal language, as calling only for a total coating of 1.50 oz. on both sides. This statement did not influence the Board, as will appear, and a careful reading of the testimony indicates the witnesses may have meant no more than that bidders in 1954 were not too careful in reading contract specifications. They were not giving a trade or commercial meaning, for they also said the language of 14–04 was unheard of and unknown.

Plaintiff's officials read the specifications and determined in their own minds that the Government really wanted a zinc coating aggregating 1½ ounces of zinc on both sides. They did this because of their experience in steel work, "the information of the industry", and because a thickness for single sides had never before been specified. They related this 1½ ounces to the figure, supra, for Class C 24-gage, although 20-gage was also to be supplied.

In July 1954 plaintiff ordered corrugated galvanized sheets for the hangar roofing and siding, and for the hangar doors. While specifying in the order the lengths, widths and gages, the plaintiff did not specify in writing the class or weight of zinc coating required. It claims to have stated orally it desired Class C and apparently that is what it got.

In the normal Government procurement involving the use of galvanized sheeting the invitation and contract specify the class of sheeting to be used, and from this the contractors can readily ascertain exactly what is needed by consulting the pertinent tables in Federal Specification QQ–I–716. Indeed, paragraph I–5 of that specification requires that Government invitations and contracts state the class of coating desired. Both users and suppliers in the galvanized sheeting industry subscribe uniformly to such classifications. It will have been noted the contract here involved nowhere mentioned Class C.

During the course of two conferences with defendant's representatives prior to the award, plaintiff did not question the language or application of paragraph 14–04 of the technical provisions of the specifications, or inquire whether it affected Federal Specification QQ–I–716, or ask what class of sheeting was contemplated.

The galvanized sheeting the plaintiff had ordered was produced in late July or early August, and after a stay in a Houston warehouse arrived by sea transport at the jobsite late in November, 1954. Installation began in the early part of December. Defendant made no inspection of the sheeting as it arrived at the jobsite, as the job specifications provided, but it would have been difficult to inspect without removing the protective paper wrappers in which the material was delivered. The wrappers were left intact in order to protect the material in open storage. In January, 1955, the Government inspector reported to plaintiff's representative that he had noticed some discoloration of the sheeting he had seen. On March 14, 1955, the defendant's representative wrote to plaintiff that many of the siding sheets and a lesser number of the roofing sheets being installed on Hangar No. 4 "indicate improper workmanship in the galvanizing process. It appears that the sheets have some bare or improperly coated areas or salamoniac spots or defects." (Salamoniac = sal amoniac.) This representative recommended that installation of sheets with apparent defects be discontinued, and plaintiff was advised that samples would be submitted by the defendant to a testing laboratory for determination of the cause of the defects and the weight of the zinc coating.

On April 11, 1955, the Public Service Testing Laboratories, Inc., to which defendant submitted four sample sheets for testing, reported that tests disclosed less than ¾ ounce per square foot of zinc coating on each side, contrary to the direction of technical provision 14–04. The four test samples represented sheets in poor, fair and average conditions.

Corrosion was detected in these sample sheets and was deemed to be the result of temperature and humidity conditions in storage. On April 13, 1955, the defendant issued a stop order for further installation of substandard galvanized metal siding sheets pending discussion of corrective action. In its response to defendant of April 19 the plaintiff stated:

There was evidently some misunderstanding in your office about our position in regard to the galvanized metal siding at Harmon. Just as soon as this condition was discovered we immediately, before receiving any notice from you, began to take steps to have the manufacturers furnish galvanized metal siding that would pass the specifications. At no time do we intend to ask you to accept materials that do not meet the specifications. That is not the policy of this company. We confirmed this to you in our conference in your office on April 14.

Also, on April 19, 1955, the defendant issued a formal stop order directing plaintiff not to install any additional sheeting pending further instructions, and to report what corrective action the plaintiff proposed to take in regard to the defective sheeting.

By letter of May 3 the plaintiff requested the defendant to approve certain proposed corrective measures to (1) replace all sheeting already erected which showed active corrosion, (2) resume erection using only sheeting with no signs of corrosion after rigid inspection, and (3) use of sheeting which had minimum discoloration but no corrosion for interior wainscoting and hangar doors upon cleaning and painting it with zinc oxide paint, all at no change in the contract price. On May 16, 1955, the contracting officer rejected this proposal because laboratory tests had indicated the zinc coating did not meet specifications, and directed plaintiff not only to stop any further application of sheeting, but also to replace the entire amount of sheeting for all five hangars with material conforming to the specifications.

This letter was followed on June 15, 1955, with the plaintiff's letter of protest, notice of claim, and advice that it would comply with directions to replace all sheeting.

A second commercial laboratory test was performed at defendant's order by the City Testing & Research Laboratories, Inc., on June 17, 1955, on six samples of the siding and roofing sheeting which had been selected jointly by representatives of the parties. The report reflected that the amount of zinc coating on each side of the sheets ranged from .43 to .60 ounces per square foot, as compared to the .75 ounce per square foot requirement for each side in technical provision 14–04. The report also noted corrosion defects which were probably caused by the presence of water on the surfaces.

On July 7, 1955, the contracting officer issued his findings of fact, rejecting plaintiff's protest and claim on the basis that the two laboratory test reports thus far obtained disclosed that none of the ten samples submitted to tests for zinc coating weight had met the requirements of technical provision 14–04. Finding No. 4 referred to the contracting officer's previous letter of March 14, 1955, in which the contractor had been advised that "many of the corrugated metal siding and roofing sheets being installed on Wing Hangars have bare or improperly coated areas or defects." and that "samples of the material would be submitted by the government to a laboratory for determination of the cause of the defects as well as the weight of the galvanizing." From this it is construed that the defects in the sheeting which caused the contracting officer to issue his stop order were the indications of corrosion as well as the insufficient zinc coating, since both laboratories had referred to the corrosion, and the contracting officer's previous letter of March 14, 1955, had referred to "some bare or improperly coated areas or salamoniac spots or defects." The contracting officer's findings of fact of July 7, 1955, were transmitted to plain-

tiff by letter of July 20, 1955, in which the contracting officer disallowed the plaintiff's protest.

In a notice of appeal dated August 11, 1955, to the Chief of Engineers, the plaintiff alleged that Federal Specification QQ–I–716, referenced in paragraph 14–02 of the technical provisions, prescribed the method for testing zinc coating, that the tests initiated by defendant were improperly made and the interpretations thereof were erroneous, and that all the sheets complied with the contract specifications.

The defendant thereafter had a test performed by the National Bureau of Standards to determine the weight of the coating on each side separately of 44 samples of galvanized sheets jointly selected by representatives of the parties. The report submitted on November 4, 1955, concluded that 59 percent of the galvanized sheets tested had an average zinc coating weight of less than .75 ounce per square foot on one side or the other of each separate sheet.

Plaintiff submitted 23 random sheets of roofing sheeting and 18 sheets of siding sheeting for testing to the Pittsburgh Testing Laboratory, plus three other sheets that are not germane to this controversy. The laboratory's report of November 9, 1955, disclosed that six (26 percent) of the 23 roofing sheets had less than either the nominal *or* minimum zinc coating requirements of Federal Specification QQ–I–716 for 20-gage Class C sheets, and two (11 percent) of the 18 siding sheets had less than the nominal *or* minimum coatings required by the same specification for 24-gage Class C sheets. The test applied to these samples were in accordance with Federal Specification QQ–I–716. The laboratory report also stated that "The majority of the sheets tested showed severe signs of weathering."

At the contracting officer level the plaintiff had not raised the issue of which specification controlled the zinc coating requirement. Accordingly, the CEBCA, as the appellate body of first resort, elected not to deal with this issue. Instead, it denied the plaintiff's claim *in toto* on the grounds that the galvanized sheeting was defective because of corrosion and, therefore, properly rejected by the contracting officer.

On plaintiff's subsequent appeal to the ASBCA, the Board ruled on two issues. The first was to consider and reject plaintiff's contention that Federal Specification QQ–I–716, rather than technical provision 14–04, governed the zinc coating requirement. In this connection it found that 60 percent of the sheeting had less than .75 ounce of zinc coating per square foot on at least one of the two sides of each separate sheet, and was, therefore, to be rejected for non-compliance with technical provision 14–04. The second issue dealt with the problem of defects due to corrosion. Since 60 percent of the total quantity of sheeting had been found to be rejectable for deficiency of zinc coating, the fate of the remaining 40 percent depended on the portion thereof suffering from an unacceptable degree of corrosion. Here the ASBCA differed from the CEBCA, holding that only half of the sheets was unacceptably corroded, which left 20 percent of the total number of rejected roofing and siding sheets for which plaintiff was entitled to compensation in an amount to be determined by the contracting officer on remand. To this the ASBCA added the cost of half of the galvanized sheets for sliding hangar doors, for the reason that Federal Specification QQ–I–716 expressly applied to them under the contract rather than technical provision 14–04, the other half not being acceptable because of the pervasive corrosion.

Plaintiff both disagreed with the conclusion that technical provision 14–04 governed the zinc coating requirement rather than QQ–I–716 and with the percentage of various sheetings found to be properly rejected, rejection being based on the lack of the required amount of zinc coating or the existence of corrosion. We hold both of plaintiff's positions lacking of merit.

There seems to be little reason for finding any real discrepancy or ambiguity in the contract provisions. According to testimony, the Engineers intended that 14–04 should supersede QQ–I–716 and that the latter should not apply to the hangar roofs and walls involved in this dispute. That intent would seem to have been stated. It is difficult to see how any bidder could have supposed that QQ–I–716 applied inasmuch as it described several classes of sheets, and to trigger its application, the Government would have needed to state what class was to be supplied. This it did not do. If, however, QQ–I–716 did apply, the question would arise whether the bidder was expected to satisfy both specifications. If he thought he was, it was possible for him to do it. Apparently, after rejection of the original supply, the ultimate supply by plaintiff of Class B sheeting did substantially satisfy both 14–04 and QQ–I–716 and if there was any detail wherein it did not do so, the record fails to show what it was. However, if both specifications applied and plaintiff had any real reason to think it could not conform to both, plaintiff had reason to think there was a discrepancy and it still cannot prevail because instead of jumping to conclusions as to what 14–04 meant, it should have asked a few questions.

Plaintiff argued that its interpretation of the specifications, i. e., that QQ–I–716 controlled, that not less than .75 ounces of zinc coating per square foot on each side meant 1.50 ounces on both sides, was a reasonable construction of Government drafted specifications and therefore should control. In support of this position plaintiff cited Kings Electronics Co. v. United States, 341 F.2d 632, 169 Ct.Cl. 433 (1965), that case citing with approval Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). While the "reasonableness" of the contractor's interpretation may sometimes be controlling in resolving a controversy of this nature, see, e. g., L. Rosenman Corp. v. United States, 390 F.2d 711, 182 Ct.Cl. —— (1968), in the instant case that argument overlooks Article III of the contract and the legal significance the inclusion of that clause (or one like it) in a contract carries. Article III provided:

*ARTICLE III. Specifications and Drawings.—* * *

> In any case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without this determination shall be at his own risk and expense. * * *

It scarcely can be doubted that plaintiff's argument asserts, with whatever validity, the existence of such a discrepancy. In Beacon Construction Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963), a contract provision similar to Article III, called on the contractor to submit any discrepancy in the figures, drawings or specifications to the contracting officer for a ruling. There were surfacial inconsistencies" within the specification in question and between that specification and the drawing. However the contractor did not consult with the contracting officer to clear up the inconsistency but instead chose to make and rely on its own interpretation of what was required by the contract, partially relying on its understanding of trade practice. Finding (314 F.2d at 503, 161 Ct.Cl. at p. 4) that the inconsistencies "were and must have been obvious to plaintiff from the time it began to prepare its bid." and that (314 F.2d at 504, 161 Ct.Cl. at p. 6) "the discrepancy was in actual fact, and in reason must have been, fully known to plaintiff before it computed its bid," the court denied plaintiff recovery. The court said (314 F.2d at 504, 161 Ct.Cl. at p. 6) a prime purpose of the contract provision calling for a ruling was to enable the parties "to clarify the contract's meaning before the die [was] cast." and (314

F.2d at 504, 161 Ct.Cl. at p. 7) that where the contractor was "presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult [with] the Government's representatives if he intends to bridge the crevasse in his own favor." * * *. Accord, Jefferson Construction Co. of Florida v. United States, 364 F.2d 420, 176 Ct.Cl. 1363 (1966), cert. denied 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); Southern Construction Co. v. United States, 364 F.2d 439, 176 Ct.Cl. 1339 (1966); Black, Raber-Kief & Associates v. United States, 357 F.2d 355, 174 Ct.Cl. 302 (1966).

■ Plaintiff would have us say *Beacon* is not in point because there the possible conflict was noticed by the contractor immediately before it had undertaken the performance of the contract. In the instant case, said plaintiff, it was only after the sheeting had been ordered that plaintiff was made aware of the Government's contention that plaintiff had made an incorrect interpretation of the specifications. We would not so limit *Beacon*. Where the discrepancy occurs in the specifications themselves, the discrepancy exists from the very start. It is the existence and type of the discrepancy, not necessarily the contractor's actual knowledge of it, that imposes a burden of inquiry on the contractor in the face of a provision like Article III. It is where " * * * a contractor knew or *should have* known of an obvious error in the plans or specifications [that] he must call it to the attention of the appropriate Government representatives so that proper steps may be taken with respect to the matter. * * *" Allied Contractors, Inc. v. United States, 381 F.2d 995, 1000, 180 Ct.Cl. 1057, 1064, (1967). Accord Unicon Management Corp. v. United States, 375 F.2d 804, 179 Ct.Cl. 534 (1967). Plaintiff did notice paragraph 14–04 and did meditate on what it took to be its apparent conflict with QQ–I–716, and chose to resolve it by ignoring the plain language of 14–04.

■ We hold that if specifications 14–04 and QQ–I–716 were inconsistent, the inconsistency was "obvious", Allied Contractors, Inc. v. United States, supra, 381 F.2d at p. 999, 180 Ct.Cl. at p. 1062, and "major", Blount Brothers Construction Co. v. United States. 346 F.2d 962, 973, 171 Ct.Cl. 478, 496 (1965), and not merely "obscure in nature.", Tufano Contracting Corp. et al. v. United States, 356 F.2d 535, 540, 174 Ct.Cl. 398, 407 (1966). It required no information except the contract clauses themselves and matter the contractor claimed that it knew in its testimony. Therefore, under the rule of *Beacon Construction Co.*, cases in accord with that decision, and *Allied Contractors, Inc.*, supra, the plaintiff, having bridged the crevasse in his own favor without having consulted the Contracting Officer as required by Article III, cannot recover on its demand.

Plaintiff's counsel urges the theory plaintiff adopted when it ordered the steel. The errors in that theory are numerous. First, the initial table in Federal Specification QQ–I–716 did not specify a nominal coating of 1.50 for any class of *20*-gage sheet. The lowest nominal weight specified, that being for 20-gage, Class "C" sheet, was 1.75. Thus, while plaintiff's interpretation led it to believe that the 24-gage sheets required by the contract were Class "C" sheets, that interpretation could not have properly led to the same result for 20-gage sheets. Next, the second table in QQ–I–716 prescribed nominal and minimum zinc coating weights for 20-gage, Class "C" sheets of 1.75 and 1.35 ounces, respectively, and for 24-gage, Class "C" sheets of 1.50 and 1.15 ounces, respectively, neither of which *minimums* corresponded to 14–04, that specification requiring "not less than" 1.50 ounces on both sides (if projected from the .75 ounce requirement for each side). As used in 14–04, "not less than" is closer in meaning to "minimum" than it is to "nominal". Third, QQ–I–716 did not prescribe a *minimum* coating of 1.50 ounces for any class of gage of sheeting. The nearest *minimum* was 1.60 ounces

and this applied to sheeting with a nominal coating of 2.00 ounces. The closest approximation in QQ–I–716 to a class of sheeting with a nominal coating of 2.00 ounces was the 2.5 ounces for 20 or 24-gage sheeting of Class "B".

If the defendant was at fault in not specifying the class of sheeting required (but Cf. Albert J. Jansen, d/b/a Mercury Service v. United States, 344 F.2d 363, 170 Ct.Cl. 346, (1965) this obvious omission was enough to put plaintiff on notice that something was amiss. Again, a reading of 14–04 in conjunction with QQ–I–716 showed that Class "C" sheeting would not meet the coating requirements of the contract. Yet, plaintiff chose to go ahead by supplying Class "C" sheeting for both gages. And, most important on the question of making inquiry of the Contracting Officer to resolve discrepancies, plaintiff admitted it had never before encountered the equivalent of 14–04 and stated that a requirement of .75 ounces of zinc per square foot on *each* side was previously unknown. What better situation to ask for guidance than one where an unknown, never before seen specification appears in a contract, seemingly describing a class of sheeting not known to the industry. Clearly, had the Contracting Officer been consulted he would have taken the position, and rightly so, that the specific requirement of a technical provision of a contract, e. g., 14–04, controls over a provision which is of general application, e.g., 14–02, which contained a general reference to QQ–I–716. Rust Engineering Co. v. United States, 95 Ct.Cl. 125, 137–138 (1941).

The next question relates to the percentage of the various sheetings found by the Board to be properly rejected. The Board found that 60 percent of the roofing and siding sheets were *properly rejected* on the ground that they lacked the zinc coating required by specification 14–04 and that half of the remaining 40 percent of those sheets and half of the galvanized sheets for the hangar doors were proper-

ly rejected on the ground that they were corroded. The Board's mathematical computations concerning this question of fact—the percentage of defective sheets —are final and binding on us if supported by substantial evidence. Jefferson Construction Co. of Florida v. United States, supra, 364 F.2d at 424, 176, Ct.Cl. at 1371. We hold they are.

Where, as here, there are a variety of samplings and tests, it is clear the support of substantial evidence would exist for a variety of percentages, under Wunderlich Act standards, 41 U.S.C. §§ 321, 322. This includes the 60 percent figure, as well as others higher and lower. It does not rest on the Bureau of Standards tests alone, and thus any alleged error in the Bureau sampling does not affect our conclusion. And a reduction of 5 or 10 percent in the Board figures is not indicated because a Bureau witness conceded their test method may err by 5 or 10 percent. He did not know whether the error would be up or down. *Non constat* that a 10 percent adjustment in the weight of the zinc coating would transfer 10 percent of the samples from the reject to the acceptable column.

The burden is on the plaintiff specifically to show why the Board's findings of fact are arbitrary, capricious or not supported by substantial evidence. Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. —— (1968). Plaintiff made no effort to do this regarding the Board's finding that 60 percent of the roofing and siding sheets lacked the required zinc coating. In any event, all the test results support this conclusion, more or less.

Plaintiff and defendant have both attacked the Board's second finding that 50 percent of the remaining roofing and siding sheets and 50 percent of the hangar door sheets were defective due to corrosion. This corrosion occurred after manufacture and before installation. It represented a substantial depletion of the zinc coating, whether originally adequate or inadequate. It was due to the long period that elapsed between manu-

facture and installation, during much of which the sheets were in warehouse at Houston, Texas, in the hold of a vessel in transit to Newfoundland, and then stored at the work site. During all this time, the sheets were wrapped in double paper. Changes in temperature, in humid climates, caused moisture to collect inside the paper on the sheets, and their ventilation was obstructed by the paper. Evidence showed that these conditions produced corrosion which was very destructive to the zinc coating, and that the sheets would have corroded less if stacked in the open, entirely uncovered. After the sheets arrived at the site, they should, under the contract, have been stored at a tilt, but evidence showed that they were not. Plaintiff was responsible for maintaining the sheets in condition until installed in the hangars, and failed to do it. On this point we need do no more than quote from the Board's opinion, *J. A. Jones Construction Company*, ASBCA 5798, supra, at pp. 16,-865–16,866:

> Evidence before us also indicates that some of the corrugated sheets showed signs of corrosion before and after they were applied to the hangars. According to the witnesses, the corrosion seen on the sheets ranged from discoloration, or wet storage stains—an early stage of the corrosive process—to the more advanced stage evidenced by the presence of zinc carbonate, a product of zinc corrosion. The contract authorized rejection by the contracting officer of defective material. Corrugated sheets which have started to corrode unquestionably are defective materials. * * * The evidence before us indicates that more than 50 per cent of the sheets showed evidence of an advanced stage of corrosion.
>
>     *     *     *     *     *     *
>
> * * * We find no provision, however, which authorized rejection of all material upon a showing of defects in some of the material. Material which did comply with specifications and did not contain defects could not properly

be rejected. Moreover, assuming sample inspection [by the Government of the allegedly corroded sheets] was appropriate for use in this case * * * the evidence will not support a finding that the samples tested were reasonably representative of the material from which they were selected and hence total rejection [as the Corps of Engineers Board had decided] premised on test results of those samples cannot be sustained. On the record before us we are unable to find that all of the corrugated sheets were defective or failed to meet contract requirements. The rejection of all sheets was therefore improper. * * we are compelled to determine how much of the material was defective and failed to comply with contract requirements based on the record before us.

> * * * We find that 60 per cent of the sheets failed to comply with the zinc coating requirement. Of the remaining 40 per cent, we must find, based on the evidence that 50 or more per cent was corroded, that half thereof was properly rejected as defective. We therefore conclude that 20 per cent of the rejected [roofing and siding] material was improperly rejected.
>
>     *     *     * As for [the galvanized sheeting for the hangar doors], if any was in fact rejected and replaced, since there is no evidence to indicate that it failed to comply with the Federal specification [QQ–I–716], we find that only 50 per cent was properly rejected. This conclusion is based on the evidence that more than 50 per cent of *all* sheets were corroded. (Emphasis supplied.)

With respect to this issue, too, the evidence shows substantial support for a wide range of findings as to the percentage of sheets that were unacceptable due to corrosion between manufacture and installation. Fifty percent is within the range. We decide, as did the Board, that 20 percent of the roofing and siding sheets and 50 percent of the hangar door sheets should not have been

rejected.[1]  In accordance with our decision, the matter will be returned to the Board for a determination of the amount due the plaintiff.

In sum, the assignments of errors by plaintiff and defendant are without merit.  The petition is dismissed insofar as it claims any recovery not allowed in the determination of the ASBCA.  Further proceedings shall be suspended to enable the parties to apply to the ASBCA for determination of damages.

---

1. The Government also disagreed with the percentages of sheeting found by the Board to have been properly rejected. The Government argued that all of the hanger door sheeting and the balance of the roofing and siding sheeting which did meet the zinc coating requirements should have been rejected because of incipient and actual corrosion.  Our decision that the Board's findings were supported by substantial evidence obviates a discussion of the Government's argument.