**CONTAINER TRANSPORT INTERNA-
TIONAL, INC.**

v.

**The UNITED STATES.**

**No. 195–67.**

United States Court of Claims.

Feb. 19, 1971.

Alan F. Wohlstetter, Washington, D.
C., attorney of record, for plaintiff.
Denning & Wohlstetter and Sidney I.
Goldman, Washington, D.C., of counsel.

John Charles Ranney, Washington, D.
C., with whom was Asst. Atty. Gen. L.
Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARA-
MORE, DURFEE, DAVIS, COLLINS,
SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial
Commissioner Roald A. Hogenson with
directions to make findings of fact and
recommendation for conclusions of law
under the order of reference and Rule

134(h). The commissioner has done so in an opinion and report filed on February 12, 1970. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff. Defendant urged that the court adopt the said report as its basis for decision in the case, although the report recommended dismissal of defendant's counterclaims, as well as plaintiff's petition, to which extent it is adverse to defendant. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the trial commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, neither plaintiff nor defendant is entitled to recover and plaintiff's petition and defendant's first and second counterclaims are dismissed.

### OPINION OF COMMISSIONER

HOGENSON, Commissioner:

Plaintifif was one of 15 carriers which participated in a mass movement of household goods of individual members of the Air Force from Evreux-Fauville Air Base, France, to Lockbourne Air Force Base, Ohio.

In accordance with defendant's established program with respect to movement of household goods, plaintiff and the other carriers provided to defendant door-to-door container service, which involved the prepacking and loading of the household goods of an individual member of the Air Force into specially designed containers at the origin residence of the member, transportation of the loaded containers to the port of departure, arrangement for movement via ocean vessels, transportation of the loaded containers beyond the port of discharge to the destination residence of the member, and placing the household goods in the new residence.

The mass movement from Evreux-Fauville occurred in the period from March 10 through June 30, 1964. During that period, defendant's transportation officer at Evreux tendered separately to plaintiff 35 shipments, each involving the household goods of one Air Force member, and issued separately to plaintiff a bill of lading on each shipment.

After plaintiff had accomplished the delivery of the shipments, plaintiff billed, and defendant paid in accordance with its administrative practice, the total sum of $95,200, billed and paid on the basis of a special volume rate of $34 per cwt., with a minimum weight of 8,000 pounds per shipment.

The actual weights of the 35 shipments, as shown by the individual bills of lading, varied from 466 to 6,837 pounds. Plaintiff was paid $2,720 on each shipment. For example, one shipment involved 4,080 pounds, but plaintiff billed and was paid for 8,000 pounds thereon.

The rate of $34 per cwt., with a minimum weight of 8,000 pounds, was the volume rate which plaintiff and the other participating carriers had filed with defendant on the pertinent mass movement of household goods, as hereinafter related.

Under the appropriate heading on each of the bills of lading, Tariff or Special Rate Authorities, defendant's transportation officer at Evreux caused each bill of lading to carry the annotation that the shipment was moving pursuant to the volume rate of $34 per cwt. Such annotations were made pursuant to a directive from the Defense Traffic Management Service (DTMS) of the Department of Defense. DTMS was defendant's agency which obtained the filing of the volume rate by plaintiff and other carriers.

Subsequently, in the performance of its audit function, the General Accounting Office issued to plaintiff notices of overcharges on the 35 shipments in the total sum of $46,959.57. GAO applied plaintiff's previously filed rate, covering the same origin and destination points, of $35.30 per cwt., with a minimum

weight of 500 pounds per shipment. For example, adverting to the above-mentioned shipment of 4,080 pounds, GAO applied the rate of $35.30 per cwt. to 4,080 pounds, thus computing the transportation charges on that shipment at $1,440.24. On the only shipment involving less than 500 pounds, i. e., 466 pounds, GAO applied the same rate to 500 pounds for a charge of $176.50 on that bill of lading.

In this manner, GAO reduced the total amount of transportation charges on the 35 shipments from the $95,200 previously billed and paid to $48,240.43, a reduction of $46,959.57. Defendant recouped the latter sum by withholding amounts otherwise payable by defendant on subsequent undisputed transportation services rendered by plaintiff. Plaintiff seeks judgment in that sum.

Defendant's basic position is that the $34 volume rate is applicable to the actual weight of each shipment. In the alternative, and if the volume rate is not applicable under defendant's theory, due to defendant's failure to offer at least 8,000 pounds of household goods at the time of each tender to plaintiff of a shipment, defendant's contention is that plaintiff's previously filed rate of $35.30 per cwt., with a minimum weight of 500 pounds, remained in effect throughout the pertinent mass movement, and that defendant is entitled to application of that rate as the more favorable rate available.

Plaintiff contends that the $35.30 rate was cancelled by the filing of the $34 volume rate, and that plaintiff is entitled to application of the volume rate to 8,000 pounds per shipment, because of the failure of defendant to make a tender of 8,000 pounds at the time of each proffered shipment.

Defendant has withdrawn its second counterclaim, and its theory with respect thereto is not mentioned in this opinion.

On the basis that the applicable rate is $34 per cwt., applied to 8,000 pounds for each of the individual shipments, the amount of plaintiff's recovery would be $46,959.57.

On the basis that the applicable rate is $34 per cwt., applied to the actual weight of each individual shipment, the amount of defendant's recovery on its first counterclaim would be $1,815.75.

On the basis that the applicable rate is $35.30 per cwt., applied to the actual weight of each of the 34 shipments which exceeded 500 pounds, but to 500 pounds on the one shipment which weighed less than that amount, the correct transportation charges for the services furnished to defendant in this case have been fully paid in accordance with the computation by the General Accounting Office.

It is my opinion that neither plaintiff nor defendant is entitled to recover, and that plaintiff's petition and defendant's first and second counterclaims should be dismissed.

By letter dated February 7, 1964, DTMS wrote to all household carriers who were authorized to provide service for the Department of Defense from France to the Continental United States (including plaintiff), concerning the mass movement in this case. DTMS requested confirmation by February 17, 1964, of a rate on such movement of $34 per cwt., with a minimum weight of 8,000 pounds, with an additional charge of $5 applicable for each delivery stop after the first one. With respect to its proposed volume rate, DTMS further stated:

* * * *This is an exception to the minimum weight published in your basic tender.* [Italicizing in original document.] * * *

Plaintiff's existing rate on file with DTMS was $35.30 per cwt., with a minimum weight of 500 pounds, on the origin and destination points involved in this case.

DTMS requested filing of an EAM card rate tender as soon as possible after confirmation by a carrier of the proposed volume rate, and stated that "Type change Code 4" was to be used on such card rate tender.

By letter dated February 10, 1964, plaintiff quoted to DTMS a rate of $34

per cwt., with a minimum weight of 8,000 pounds, with an additional charge of $5 applicable for each delivery stop after the first delivery. Plaintiff stated that the quoted rate was "an exception to the minimum weight published" by plaintiff in its existing rate tender. Plaintiff supplied the requested card rate tender, describing it as the "EAM card rate tender showing Type Change Code 4."

At the time of the DTMS request for and plaintiff's filing of the volume rate, both plaintiff and DTMS knew that each of the pertinent shipments of household goods of an individual member of the Air Force would weigh substantially less than 8,000 pounds. In fact, DTMS intended that in the application of the volume rate, two or more shipments, aggregating 8,000 pounds or more, would be tendered to a qualified carrier (such as plaintiff) at a single time for defendant to receive the benefit of the lower volume rate. This intention was not communicated to defendant's transportation officer at Evreux, and he believed that the $34 volume rate would be applicable if a qualified carrier received at least 8,000 pounds of household goods in the overall mass movement, irrespective of the weights of the individual shipments. He conceded, and it is found, that it would have been possible for him to offer each carrier at least 8,000 pounds of household goods at one time before offering any to the next qualified carrier.

The above-mentioned letter of DTMS advised the carriers that the volume movement would amount to 2,540,000 pounds of uncrated household goods, with the movement to occur from April 1 to June 30, 1964, later advanced to March 10, 1964, with the written concurrence of plaintiff.

The pertinent EAM card submitted by plaintiff to defendant was an electronic punch-card prescribed by DTMS for use in its computerized accounting, obtainable from any IBM supply facility. Such card was appropriately punched to show plaintiff's submission of the pertinent

$34 per cwt. rate, with a minimum weight of 8,000 pounds. Such card contained on its face the following printed provision: "(This cancels all previous filing for this installation.)"

The reverse side of such card contained several printed standard provisions, the last of which was the following:

23. Alternation: Volume of Traffic—This tender will not apply where charges accruing hereunder exceed charges otherwise applicable for the same service. Receipt of this tender shall not be construed as a guarantee by the government of any particular volume of the traffic hereunder described.

Plaintiff had appropriately punched the EAM card (in column 46 thereof) to show the above-mentioned Type Change Code 4.

The Type Change Code 4 was an "in-house" determination, i. e., within the Personal Property Directorate of DTMS, to differentiate any EAM card rate filing on volume movement from any other filing previously authorized for the same origin and destination points of shipment.

At all times relevant in this case, DTMS had outstanding written instructions to all DTMS approved household goods carriers, concerning procedures for submission by carriers of EAM card rate tenders on shipments of household goods, to conform with the method established by DTMS for computer analysis of household goods tenders.

A copy of such instructions had been supplied to plaintiff by DTMS.

The DTMS instructions pertained only to rates based on a 500-pound minimum weight, as shown by the following language contained therein:

The minimum weight will be standardized at 500 pounds. All rates will be based on a 500-pound minimum and there will be no allowance for any other minimum weights. This will prevent the use of minimum weights as a gimmick.

No mention of volume movement rate tenders was contained in such instructions.

With respect to EAM card rate submissions on the basis of a 500-pound minimum weight, the instructions stated:

Each rate tender submitted will cancel the preceding rate tender on file between the same two (2) points (origin installation and destination area). In other words, there will be only one rate tender on file for each carrier to and from any pair of points. So each submission will be cancelled by any subsequent submission, but if you want to withdraw or cancel any rate and have no rate on file, you may do this by the procedure outlined in the succeeding paragraphs.

In addition to other fields of information to be supplied by punching of the EAM tender card at different locations in various columns thereof, the DTMS instructions provided for punching of column 46 in three different manners, or codes, to show rate changes to be accomplished by the filing of an EAM tender card. Such changes, relating only to 500-pound minimum weights, were defined as follows:

*Type Change.* There will be only three types of changes accepted by DTMS. These changes are Gains, Losses, and Changes. A gain represents at [sic] initial filing at a specific area, i. e., all filings in the first five working days in December will all be gains. Losses represent withdrawals or cancellations when no other rate replaces the one on file. The changes represent all other filings. The codes are as follows:

| Code: | *Type change* |
|---|---|
| 1 | Loss. |
| 2 | Gain. |
| 3 | Rate Change. |

No mention was made in the DTMS instructions concerning a Type Change Code 4, nor was any explanation in writing ever issued by DTMS. Repeated oral inquiries were made by various carriers, and oral explanation furnished by DTMS concerning the same.

Plaintiff neither inquired of DTMS concerning, nor was it furnished an explanation of the meaning of a Type Change Code 4.

To comply with the provisions of the DTMS instructions, any carrier which had a 500-pound rate on file, which it desired to cancel in connection with its submission of the volume rate involved in this case, would have filed an EAM card in accordance with the provisions of the DTMS volume movement proposal, and to cancel its 500-pound existing rate, would have punched a Type Change Code 1, with appropriate punching in the rate column of the card, as provided in the DTMS instructions. This plaintiff did not do.

A carrier could not otherwise accomplish a change in his existing 500-pound rate by the filing of an EAM card, insofar as the provisions of the DTMS instructions were concerned, because the required date for its submission of the volume rate (February) did not correspond with the scheduled filing period (December) for changing a regular 500-pound rate on file.

Had plaintiff made inquiry of DTMS as to the meaning of a Type Change Code 4, plaintiff would have been informed by DTMS that such code change would not cancel plaintiff's existing 500-pound rate, but that such prior rate would remain in effect and available to DTMS on the pertinent shipments.

The position of DTMS is fully consistent with the statements in the DTMS letter request for submission of the pertinent volume rate, and in plaintiff's letter quotation of such rate, that the volume rate was to be "an exception to the minimum weight" published in plaintiff's existing 500-pound rate. Such language is reasonably to be interpreted as contemplating that the existing rate was to remain in effect, with the volume rate to be an exception thereto.

Considering the provisions of the outstanding DTMS instructions, with which

plaintiff must have been thoroughly familiar as an experienced carrier of household goods for defendant, one cannot reasonably ascribe unequivocal meaning, as plaintiff contends, to the printed provision on the face of the pertinent EAM card: "(This cancels all previous filing for this installation.)" Obviously this card provision was intended for change of a 500-pound rate at the time provided in the instructions.

■ Moreover, in accordance with axiomatic rules of contract construction to the effect that all provisions of a contract are to be considered in determining meaning to be ascribed to one provision thereof, and that meaning should be given to one provision which will give reasonable force and effect to all provisions of the contract, the above-quoted provisions of the alternation clause on the EAM card stood as a warning to plaintiff that the volume rate was only "an exception" to the existing 500-pound rate, leaving the latter available to defendant in the pertinent mass movement of household goods.

■ Taking all of these factors into consideration, along with the use by both DTMS and plaintiff of the unexplained term "Type Change Code 4," it is reasonably to be concluded that there was at least a patent ambiguity in the agreement between the parties for the transportation of the pertinent household goods, with respect to the continued availability of the 500-pound rate. Plaintiff had the duty to inquire of DTMS as to the meaning of a Type Change Code 4, in relationship to the alternation clause and with respect to the statement that the volume rate was "an exception" to plaintiff's published rate. Since it failed to do so, its interpretation of the cancellation clause on the face of the EAM card cannot be sustained. J. A. Jones Constr. Co. v. United States, 395 F.2d 783, 789, 184 Ct.Cl. 1, 12 (1968).

It is held that plaintiff's previously existing rate of $35.30 per cwt., with a minimum weight of 500 pounds re-mained in force and effect throughout the pertinent mass movement. If the 500-pound rate was the lowest available rate, it follows that the General Accounting Office correctly computed the pertinent transportation charges on that basis. Great Northern Ry. Co. v. United States, 178 Ct.Cl. 226, 241 (1967).

An even lower rate would be available, however, if defendant were correct in its contention that the $34 volume rate was applicable to the actual weight of each shipment, as this would result in a further reduction of the pertinent transportation charges by $1,815.75.

■ An essential element in the application of a volume rate is the requirement that a shipper tender the specified minimum weight of the commodity to the carrier at one time to be shipped from one origin to one destination. Baggett Transportation Co. v. United States, 319 F.2d 864, 162 Ct.Cl. 570, 584–586 (1963); Hughes Transportation, Inc. v. United States, 169 Ct.Cl. 63, 68 (1965). Defendant failed to tender the pertinent minimum of 8,000 pounds of household goods at any one time in the pertinent mass movement. Thus, since each shipment tendered in this case weighed less than the volume minimum weight of 8,000 pounds, and if plaintiff's prior existing rate was cancelled, plaintiff would have been entitled to transportation charges on the basis of application of the volume rate of $34 per cwt. to the minimum weight of 8,000 pounds per shipment, and not on the basis of application of such rate to the actual weight of the shipment. Baggett Transportation Co. v. United States, supra, 319 F.2d at 864, 162 Ct.Cl. at 585.

This rule cannot reasonably be abrogated by the circumstances that in spite of the failure of defendant's transportation officer at Evreux to tender 8,000 pounds, or more, at one time, plaintiff was able to consolidate shipments at Le Havre, France, for transportation on ocean bills of lading, and the plaintiff was probably able to consolidate shipments at New York, Baltimore, or Toledo, for land transportation to Lock-

bourne Air Force Base. Any advantages which plaintiff was able to obtain by its own devices, in spite of the failure of defendant to tender the required volume of shipments at the origin base, as intended by DTMS, furnishes no reasonable ground for establishment of a valid counterclaim against plaintiff in accordance with defendant's theory.

With respect to defendant's contention that the volume rate was applicable to the actual weight of each shipment, full consideration is given to the fact that it was well known by plaintiff that its pertinent volume rate was submitted on a mass movement from the base in France to the base in Ohio, but it is of major significance in this case that plaintiff was not the sole carrier utilized on the mass movement, but was required to participate with 14 other carriers. On the basis of defendant's method of distribution of the shipments to all 15 carriers by use of a rotation roster, plaintiff could expect to receive by weight only about $\frac{1}{15}$ of the available shipments, if an equal distribution was accomplished by defendant, as intended.