Elizabeth C. CRESSWELL, doing business as Aircraft Purchasing and Service Company

v.

UNITED STATES.

No. 328–55.

United States Court of Claims.
June 3, 1959.

Richard E. Bauman, New York City, for plaintiff.

George L. Ware, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LARAMORE, Judge.

Plaintiff sues for payment of a delivery of crude asbestos under the terms of a supply contract No. GS–OOP–3176.

The facts are these: Plaintiff has been engaged in the importing business since 1937. Between August 27, 1951, and June 16, 1952, plaintiff negotiated with

the General Services Administration for the sale of asbestos. During the negotiations the terms of the contract were explained to her. Plaintiff submitted a sample of the materials offered in connection with National Stockpile Specifications P–80–R. After the sample had been analyzed, plaintiff received a letter dated January 9, 1952, which stated in pertinent part:

"It thus appears that the material would meet the requirements of National Stockpile Specification P80 dated 12 September 1951, but would be subject to a combined penalty of 11.7% which would be applied as a corresponding reduction in the contracted unit price on the out-turn weight of the lot as received."

Plaintiff entered into contract No. GS–OOP–3176 with defendant about June 16, 1952. Said contract provides in pertinent part:

"The materials, supplies and/or services to be obtained by this instrument are authorized by, are for the purposes set forth in, and are procured pursuant to the Strategic and Critical Materials Stock Piling Act, Public Law 520, 79th Congress, approved July 23, 1946, 50 U.S.C.A. § 98 et seq. Payment will be made by the Emergency Procurement Service upon the receipt of properly certified invoices, as more particularly provided for in the attached Special Terms, Conditions and Specifications.

"DATE OF EXECUTION BY CONTRACTOR. June 10, 1952.

"The undersigned agrees to furnish the following on the terms specified on this page and on the continuation sheets, numbered 2 to 8 inclusive, and general conditions attached hereto and made a part hereof, including delivery f. o. b. vessel Arica, Chile.

"Methods of packing, marking, weighing, sampling, inspecting and shipping shall be as provided herein, except as otherwise directed by the Government. Shipping instructions will be furnished by the Government as herein provided.

"SCHEDULE OF DELIVERIES. See paragraph 3 of Special Articles.

| Item No. | Supplies or Services | Quantity (Number of units) | Unit | Unit Price | Amount |
|---|---|---|---|---|---|
| 1 | Asbestos-Crocidolite (Bolivian) Run-of-Mine type, conforming to National Stockpile Specification P-80-R dated 17 April 1952. Material to be delivered under this contract shall have been mined in and exported from Bolivia. | Approximately 600. | Short ton. | $445 | $267,000.00 |

"GENERAL CONDITIONS FOR STRATEGIC AND CRITICAL MATERIALS AND SERVICES CONTRACTS

\* \* \* \* \* \*

"5. *Minimum Order: Weight.* Unless otherwise indicated as for example, by minimum percentage chemical content, packing requirements, lot sizes, or statement of a minimum order limitation, the unit shown for each item determines the smallest quantity which a contractor will be required to deliver. Where the unit shown is a measure of weight, such weight is understood to be net unless otherwise stated.

\* \* \* \* \* \*

"7. *Inspection and Test.* (a) All material and workmanship shall

be subject to inspection and test at all times and places and, when practicable, during manufacture. In case any materials, supplies or services are found to be defective in quality, composition, or workmanship, or otherwise not in conformity with the specifications, the Government shall have the right to reject such materials, supplies or services, or to require their correction or replacement, or to accept them at a proper reduction in price. * * *

* * * * * *

"9. *Variance in Quantity.* Unless otherwise specified any variation in the quantities delivered under the contract, not exceeding 10%, will be accepted, when caused by conditions of loading, shipping, packing or allowance in manufacturing processes.

"SPECIAL ARTICLES, TERMS, CONDITIONS AND STIPULATIONS

"1. *Quantity:*

"The quantity of material to be supplied under this contract shall be six hundred (600) short tons of Bolivian Crocidolite Asbestos, each short ton to be 2,000 pounds avoirdupois (dry basis).

"2. *Quality:*

"All material delivered under this contract shall conform to National Stockpile Specification P–80, dated 17 April 1952, for Run-of-Mine (Crude or Milled) Asbestos-Bolivian Crocidolite.

"3. *Delivery:*

"a. * * *

"b. Terms of Delivery—The Term 'F. O. B. Vessel, Arica, Chile,' to which this contract is subject, means:

"(1) Loaded and stowed or trimmed on board overseas vessel at named port of shipment, free of expense to the Government;

"(2) That it shall be the responsibility of the contractor to do the following:

"(a) Provide for, and pay and bear all charges incurred in, placing goods actually on board the vessel designated and provided by or for the Government on the date or within the period fixed;

"(b) Provide clean on-board ocean bill of lading;

"(c) Be responsible for any loss or damage, or both, until goods have been placed actually on board the vessel on the date or within the period fixed;

"(d) Render the Government, at the Government's request and expense, assistance in obtaining the documents issued in the country of origin, or of shipment, or of both, which may be required either for purposes of exportation, or of importation at destination.

"c. In the event that the Government fails to provide a vessel within 45 days after receipt of the Contractor's Notice of Availability of any lot of material for delivery, the Contractor shall have the right to deliver such lot to the Government by placing it into storage in the name of the Government in a public warehouse acceptable to the Government, at Arica, * * *

"4. *Price:*

"For all material accepted by the Government under this contract the Government shall pay the Contractor $445.00 per short ton, based on a net weight (dry basis) of 2,000 pounds avoirdupois.

"Material containing moisture in excess of two percent (2%) or foreign matter in excess of five percent (5%) and/or more than ten percent (10%) of material passing the No. 16 sieve, may be accepted provided the other requirements of Specification P–80–R are met; however, payment for such material shall be adjusted according to the amount of acceptable asbestos actually contained in the lot. In case of dispute, the referee method of test must con-

form to the methods stipulated in National Stockpile Specification P–80–R dated 17 April 1952.

\* \* \* \* \* \*

"6. *Inspection, Sampling, Weighing, Tests, and Analysis:*

"All material delivered pursuant to this contract shall be subject to inspection, sampling, weighing, tests, and analysis prior to acceptance by the Government, with all costs of said inspection, sampling, weighing, tests, and analysis performed by the Government to be borne by the Government.

\* \* \* \* \* \*

"Weighing shall be performed by, and at the expense of, the Government and shall be determined by a commercial weigher designated by the Government, who shall also determine the tare (bag) weight by weighing approximately three percent (3%) of the bags of each shipment or lot and the total weight of the bag containers shall then be determined based on an average tare (bag) weight.

\* \* \* \* \* \*

"8. *Notice of Shipment and Availability:*

"The contractor shall notify the Asst. Chief, Inspection Division, General Services Administration, Federal Supply Service, and the Chief, Storage and Transportation Division, General Services Administration, Emergency Procurement Service, both located at 7th and D Streets, S. W., Washington 25, D. C., at least fifteen (15) days prior to the anticipated date the material will be ready to leave the foreign port, and approximate total weight of the shipment so that the Government may arrange for ocean transportation of the material.

"9. *Contractor to Act as Forwarding Agent:*

"The Contractor will without additional expense to the Government, act as forwarding agent and will arrange loadings of material as authorized to ocean vessels, obtaining shipping documents indicating General Services Administration, Emergency Procurement Service, as the shipper and consignee, and will furnish prompt Air Mail advice of all such loadings."

National Stockpile Specification P–80–R limited the amount of moisture, foreign matter, and short fiber contained in the merchandise. Specification P–80–R also contained the following:

"6. INSPECTION AND TEST PROCEDURES

\* \* \* \* \* \*

"Note: The procuring agency should stipulate in the contract or order that material containing moisture in excess of 2 percent, or foreign matter in excess of 5 percent, or more than 10 percent of run-of-mine material passing the No. 16 sieve, may, at the option of the Government, be accepted provided the other requirements of these specifications are met; however, payment for such material shall be adjusted according to the amount of acceptable asbestos actually contained in the lot. In case of dispute, the referee method of test shall conform to the methods stipulated in these specifications."

On October 22, 1952, plaintiff entered into contract No. GS–OOP–3999 (Army) with defendant for 66 tons of Bolivian asbestos, conforming to specification P–80–R. Except for the amount and delivery schedule, the provisions of the contract were the same as those in the contract in suit. Under contract GS–OOP–3999, plaintiff made delivery to defendant of 66.746 short tons of asbestos, and after adjustments for failure to conform to chemical requirements, was paid for a total net tonnage of 61.704 short tons. Plaintiff has never offered to deliver additional material under this contract.

Plaintiff made arrangements for delivery of the material under the contract in issue with a Mr. Horowitz of Cochabama, Bolivia, whereupon she was

to receive six percent of the price paid for material accepted and paid for by defendant. Between September 4, 1952, and January 12, 1954, 19 lots were delivered, weighed, analyzed, and paid for. Lots 1 through 19 weighed:

"1. As per invoice.... 617.120 tons
2. As established by public weigher (Gross less Tare) ........ 598.275 tons
3. As adjusted to conform to National Stockpile Specification P-80-R dated 17 April 1952 ........ 569.684 tons"

Defendant paid plaintiff $253,509.45 for lots 1 through 19. Plaintiff billed defendant for each of lots 1 through 19 by deducting from the public weighers weight the percent of material, if any, which failed to conform to specification P-80-R. Defendant paid on this basis for lots 1 through 19.

Pursuant to paragraph 8, special articles, terms and conditions and stipulations of the contract, plaintiff advised defendant when each lot, except lot 9, was available for shipment, and defendant booked shipping for each lot except lot 9. As to lot 9, plaintiff advised defendant after the cargo was at sea and defendant concurred.

Because of variance between invoice weights and those of the public weigher, plaintiff wrote defendant on December 10, 1953, for clarification. Plaintiff was advised under date of December 30, 1953, as follows:

"Reference is made to your letter of December 10, 1953, to the Purchase Division, which has been referred to this office for reply.

"While shippers weights are used for advance payment purposes, they are not to be taken into consideration in calculating the actual quantities delivered against the contract. In determining the actual tonnage delivered, only the net weights as established by a public weigher upon approval of the asbestos in this country are to be applied against the 600 tons contracted for.

"We trust this is the information you desire."

On April 1, 1954, plaintiff gave notice of availability and applied for shipping instructions on lot 20, consisting of 33 short tons of asbestos. Plaintiff advised that the Grace Lines vessel Santa Isabel would load at Arica, Chile, on April 10, 1954, and arrive in New York City, on April 30, 1954.

By telegram dated April 6, 1954, defendant wired plaintiff as follows:

"CONFIRMING TELECON 4—6—54 CONTRACT QUANTITY UNDER GS–OOP–3176 (SCM) COMPLETED WITH PREVIOUS SHIPMENT TOTALING 598 TONS. EPS UNABLE TO ACCEPT ADDITIONAL SHIPMENT"

Plaintiff thereafter arranged for shipment of lot 20 to New York City and for storage in a public warehouse. She was billed for the following charges:
"Ocean Freight ............. $757.70
Demurrage ................. 50.00
Custom and Broker's Fees .... 23.50
Loading, labor, cartage,
    June 1954 storage
    charges ................. 322.15
July 1954 storage
    and sampling ............. 49.08
Storage August 1, 1954
    and thereafter per month ... 40.08"

She was reimbursed by the shipper except for $500 or $600 which the shipper had agreed to pay. Plaintiff does not own lot 20 and there is no evidence that she is obligated to pay for it.

If lot 20 had been accepted and had contained 30.316 short tons of acceptable material, its contract value would have been $13,490.62 and plaintiff would have received $809.44 commission.

It is plaintiff's position that the tonnage to be compared with the contract amount of 600 short tons is the amount of 569.84 tons of acceptable material paid for. It is defendant's position that the

amount to be compared with the contract tonnage of 600 short tons is the tonnage established by the public weigher of 598.275 short tons.

Thus the narrow issue as to the construction of the contract is presented. That is to say, does the contract permit plaintiff to deliver asbestos to defendant until the amount delivered, irrespective of the total gross amount, equals 600 tons of acceptable material.

■ While the question of construction is by no means an easy task, we look to the treatment given the contract by the parties; plaintiffs' knowledge as to the meaning affixed by defendant to the contract, and plaintiff's interpretation of another contract containing identical terms and specifications.

In respect to the treatment given the contract by the parties, it seems significant that on lots 1 through 19 plaintiff recognized the Government's position by billing and accepting payment in exactly the manner now urged by defendant. As shown by the facts, plaintiff billed and accepted payment on the basis of the net weights established by the public weigher, less deductions for unacceptable material. It was not until lot 20 was refused that plaintiff altered her contention and then only as to lot 20.

Furthermore, defendant's position is sustained by general article 7 of the contract, which provides that "in case any materials * * * are found to be defective in quality * * * or otherwise not in conformity with the specifications, the Government shall have the right to reject such materials * * * *or to accept them at a proper reduction in price* * * *." [Italics supplied.]

Under this provision the Government accepted the materials, but reduced the price thereof by only paying for asbestos that met contract specifications. This is not to say that the Government did not accept all the materials shipped by plaintiff. In fact it did accept and paid shipping charges on all asbestos shipped.

Under plaintiff's interpretation of the contract, she conceivably could have shipped and shipped until the acceptable tonnage reached 600 short tons, thereby forcing the Government to pay freight on material even though it lay six feet deep over the entire New York waterfront. To say that the Government could not put an end to such a situation would not only be inane but in violation of the contract terms.

In addition, plaintiff knew the position of the Government as to the construction of the contract. Before signing, the terms were explained to her. Again in December 1953, after inquiry, the Government wrote her explaining that the shippers weights were used for advance payment purposes only and were not to be taken into consideration in calculating the actual quantities delivered against the contract.

■ If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended. 3 Corbin Contracts, § 538, pp. 41, 42, 1957 Pocket Parts 15; Hurd v. Illinois Bell Telephone Co., D.C., 136 F. Supp. 125, 153, affirmed 7 Cir., 234 F.2d 942, certiorari denied Seybold v. Western Electric Co., 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124, rehearing denied 352 U.S. 977, 77 S.Ct. 352, 1 L.Ed.2d 329; 4 Page, Contracts, § 2036, p. 3518; Restatement Contracts, pp. 74–75; 2 Fed. Law, Contracts, § 379; Star Chronicle Pub. Co. v. New York Evening Post, 2 Cir., 256 F. 435, 441; Bowers Hydraulic Dredging Co. v. United States, 211 U.S. 176, 188, 29 S.Ct. 77, 53 L.Ed. 136.

■ Moreover, plaintiff entered into an identical contract with the Government (contract GS–OOP–3999, Army). Plaintiff was paid under the same construction as now urged by the Government. She did not complain or offer to deliver more material. She billed the Government on the same basis which is urged by the defendant here. This is persuasive that plaintiff interpreted the contract terms at that time in the same manner as the defendant. A previous

contract already performed and already interpreted is strong evidence of the parties interpretation of the disputed contract. Minneapolis-Moline Co. v. United States, 149 F.Supp. 146, 137 Ct. Cl. 790, 795; Union Paving Company v. United States, 115 F.Supp. 179, 126 Ct. Cl. 478, 489; Sternbergh v. Brock, 225 Pa. 279, 74 A. 166, 169, 24 L.R.A.,N.S., 1078.

Finally, before shipment of lot 20, defendant advised that it considered the contract complete and that lot 20 would not be accepted. It was on plaintiff's own responsibility that the material was shipped to New York City, and we can see no reason why the plaintiff should be paid damages therefor. This especially so after knowledge on the part of plaintiff as to defendant's interpretation of the contract.

█ Therefore, under all the circumstances, we believe plaintiff has failed to support her interpretation of the contract and the petition is dismissed.

BRYAN, District Judge, sitting by designation, JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.