**HYDRO GROUP, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 190–87C.

United States Claims Court.

July 25, 1989.

Harry R. Silver, Washington, D.C., for plaintiff.

Tamra Phipps, Washington, D.C., with whom was Acting Asst. Atty. Gen., Stuart Schiffer, for defendant.

## OPINION

RADER, Judge.

In 1985, the Department of Interior awarded plaintiff a contract to inject ce-ment slurry into an abandoned coal mine below the town of Portercrest, Alabama. The contract was necessary to reduce the danger of subsidence. Plaintiff, Hydro Group, Inc., filed this suit seeking payment for two chemicals added to the grout.

In performing the contract, plaintiff used two chemical additives—bentonite and plas-ticizer. Bentonite controls the viscosity of the grout mixture; plasticizer controls the grout's flexibility during pumping. After completing the contract work, plaintiff sought payment for these chemicals over and above the contract bid price.

The contracting officer, however, denied plaintiff's claim for additional compensa-tion. According to the contracting officer, the invitation for bids (IFB) required plain-tiff to include the costs of the additives in the bid price. Plaintiff sought recovery in the United States Claims Court.

The case is now before the Claims Court on defendant's motion for summary judg-ment. After oral argument, this court de-nies defendant's motion. Genuine issues of material fact prevent this court from grant-ing the motion. This motion, however, has served to narrow the issues for trial. On the basis of the motion, this court presents some narrow issues for expeditious resolu-tion at trial.

## FACTS

The Portercrest project was not the first dealing between plaintiff and the Depart-ment of Interior's Office of Surface Mining (OSM). In 1984–1985, plaintiff performed an OSM contract to prevent subsidence in Willowbend, Alabama. At Willowbend, plaintiff also used cement slurry to stabi-lize underground mines.

The Willowbend contract required addi-tion of bentonite to the grout, but left the use of plasticizer to the discretion of the contractor.[1] Under the Willowbend con-tract, OSM paid plaintiff for bentonite on

---

1. Willowbend Invitation for Bids (IFB), section 4.2.1. This section states, in pertinent part: "A chemical plasticizer or pumping agent *may* only be used to produce a pumpable mix which will remain in the mine entries within 75 feet of injection borehole in the mine." (Emphasis added.)

the basis of the amount actually used. The Willowbend IFB requested the bidder to include a specific bid price per pound for bentonite. After completion of the work, OSM computed the payment for bentonite by multiplying this bid price per pound times the number of pounds included in the grout.[2]

Thus, plaintiff's winning bid on the Willowbend project contained a bid price per pound for bentonite, but no such price for plasticizer. In performing the Willowbend contract, Hydro Group used both bentonite and plasticizer. Later, plaintiff submitted a bill to OSM for the plasticizer. OSM issued a change order to pay Hydro Group for the plasticizer. A formal written contract modification confirmed the change order. As with bentonite, OSM paid for plasticizer on the basis of the amount actually used.

In August 1985, OSM issued an IFB for the Portercrest project. OSM's Portercrest solicitation differed from the Willowbend IFB with regard to these key additives. With regard to plasticizer, the language in section 4.2.1 was changed from "may only be used" in the Willowbend contract to "will be used" in the Portercrest contract.[3] Under the Portercrest contract, plasticizer was mandatory. The IFB, however, did

not contain a separate bid line item for the pumping agent. The bid solicitation also required the use of bentonite in the grout mixture.[4] The IFB's itemized bid sheet, however, included no separate per pound listing for bentonite.

In sum, the Portercrest contract, unlike the earlier Willowbend contract, required use of plasticizer. Neither contract included a separate line bid per pound for plasticizer. The Portercrest IFB also required use of bentonite, but—unlike the Willowbend contract—contained no separate per pound line item for the additive.

On August 28, Mr. John Cagnassola, Vice President of Hydro Group's Drilling and Grouting Division, attended a pre-bid conference held for prospective bidders on the Portercrest project. Immediately after the conference, Mr. Cagnassola telephoned the contracting officer, Mr. Owens, and expressed concern that the bid solicitation contained no line item for chemical additives.

As a result, Mr. Owens amended the Portercrest IFB to include a new section requesting a line item bid for bentonite. The amendment to the Portercrest IFB stated:

**2.** Willowbend IFB, sections 7.12.1 and 7.12.2 states:

*7.12.1:* "Chemicals for Grout" shall include the furnishing of chemical additives for controlling the set time of the grout. Payment for the chemical additives will be made on the basis of the bid price per pound of chemicals, as furnished, times the number of pounds actually mixed and injected in the grout holes. *7.12.2:* "Bentonite for Grout" shall include the furnishing of powdered or granulated sodium bentonite for use in the grout mixtures. One cubic foot of bentonite shall be equal to 60 pounds of dry powdered or granulated bentonite. Payment for bentonite will be on the basis of the bid price per pounds times the number of cubic feet of bentonite actually mixed and injected in the grout holes.

**3.** The Portercrest IFB, section 4.2.1., states: "A chemical plasticizer or pumping agent will be used to ultimately produce a mix with a ten inch plus or minus ½-inch (10 +/− ½-inch) slump."

**4.** The Portercrest IFB, sections 4.2.1, 4.2.3.6, and 8.13.2, refer to bentonite:

*4.2.1:* Water shall be added in two applications; the first shall contain bentonite in solution, such that the initial amount of water shall introduce bentonite in the amount of two percent of the weight of the dry cement. *4.2.3.6:* Additives, if necessary, to control viscosity of grout mixtures shall consist of either powdered or granular sodium bentonite.... It is anticipated that the bentonite additives will be mixed at a rate of about two (2) percent of the weight of the cement. However, the mixing ratios of the bentonite additives shall be at the discretion of the Contractor and shall be based on the results of test [sic] conducted on the construction site. The proposed mixing ratios and test results shall be submitted to the COR prior to use. *8.13.2:* "Bentonite for Grout" shall include the furnishing of powdered or granulated sodium bentonite for use in the grout mixtures.... Payment for bentonite will be made on the basis of the bid price per pounds [sic] times the number of cubic feet of bentonite actually mixed and injected in the grout holes.

NOTE: OPTIONAL—NOT TO BE USED FOR EVALUATION PURPOSES "Chemicals"

a. *Bentonite*—delivered, stored, mixed, and pumped into mine as part of grout mix—cost per pound $_____.

Plaintiff noted that this section still left several important issues unresolved. Mr. Cagnassola stated in his affidavit:

> This new section neither provided nor requested an estimated quantity of bentonite by which to multiply the unit price, nor did the new section request a unit price for plasticizer.

Affidavit of John Cagnassola, No. 190–87C, filed July 11, 1988, at ¶ 11.

In a supplemental affidavit filed after oral argument,[5] plaintiff further alleged that the questions raised by the amendment prompted it to inquire a second time. Mr. Cagnassola allegedly called Mr. Owens again "in an effort to point at these deficiencies." Cagnassola Supp.Aff., No. 190–87C, filed June 1, 1989, ¶ 4. According to plaintiff, Mr. Owens refused to issue another modification or otherwise clarify the ambiguities.

On September 11, 1985, plaintiff submitted a bid which contained a price per pound for bentonite, but no bid price for plasticizer. On September 24, 1985, plaintiff received the contract award. During performance of the contract, Hydro Group used both bentonite and plasticizer. After performance, plaintiff requested payment for both additives above and beyond the contract price.

On October 3, 1986, OSM rejected plaintiff's claim. The contracting officer decided that plaintiff should have included the costs of the mandatory additives in the bid. Mr. Owens also considered potential ambiguities in the IFB. He decided that, even if ambiguities were present, plaintiff failed to seek clarification prior to submitting its bid.

---

5. Plaintiff argued orally that a second inquiry about a patent ambiguity was not necessary. This court continued to press its concern about fully clarifying any glaring ambiguity, particularly an ambiguity which had changed due to an amendment in the IFB. After close of oral argument, plaintiff filed an affidavit alleging that it sought a second time to clarify the questions. Plaintiff's position at oral argument is, to a degree, inconsistent with plaintiff's supplemental affidavit:

(1) In response to this court's direct question on why the plaintiff did not inquire a second time to clarify questions, plaintiff alluded to Mr. Cagnassola's state of mind after the pre-bid conference. Plaintiff stated that Mr. Cagnassola was reluctant to inquire further because when he raised concerns at the conference, he was allegedly treated "fairly abruptly" and led to believe that "if he pushed it any more, he would really antagonize them [OSM]...." Transcript of Proceedings, No. 190–87C, filed June 28, 1989, at 59–60 (Tr.). In response to a direct question on the topic, plaintiff made no mention of having made a second, follow-up inquiry.

(2) During argument, this court inquired about plaintiff's failure to completely resolve the ambiguity before making its bid. Plaintiff responded that it would be unreasonable, under the tight schedule, to clarify the ambiguity which remained after the issuance of the "OPTIONAL" section. Tr. at 31–32, 43–44. Plaintiff made no representation about a second inquiry, but implied that time prevented follow-up questioning.

(3) Plaintiff's counsel stated that plaintiff considered the second ambiguity (that resulting from the "OPTIONAL" amendment) latent. Tr. at 34. The supplemental affidavit states that Mr. Cagnassola had clear notice of a continuing ambiguity and inquired as to its interpretation.

(4) This court repeatedly inquired about plaintiff's duty to clarify fully an ambiguity:

> The Court: But what answer did you get with regard to plasticizer?
>
> Plaintiff's counsel: None.
>
> The Court: You didn't get an answer. So the ambiguity remains, is that correct?
>
> Plaintiff's counsel: That's correct. And the only choice was to go back again or just assume it was to be bid the same way as the prior contract.
>
> The Court: So we're back again to this situation where in your mind the Government answered a question with an enigma. And you feel you have no duty to clarify that enigma?
>
> Plaintiff's counsel: That's correct....

Tr. at 38–39. Plaintiff did not state that Mr. Cagnassola had gone back again to inquire.

Despite the apparent inconsistency between plaintiff's position at oral argument and its subsequent affidavit, this court construes the facts in the light most favorable to plaintiff. Thus, for purposes of this motion, this court acknowledges the validity of plaintiff's subsequent affidavit and weighs that affidavit heavily in denying defendant's motion.

Plaintiff brought this action seeking payment for the additives. Plaintiff contends the contract language does not require inclusion of the cost of additives in the original bid. Rather, plaintiff maintains that it reasonably interpreted the Portercrest IFB in light of past dealings in the Willowbend contract. Plaintiff argues that OSM did not notify Hydro Group that payment under the Portercrest contract would differ from payment under the prior Willowbend contract. Furthermore, plaintiff asserts that it brought ambiguities in the IFB to the attention of the contracting officer, thus appropriately responding to any patent ambiguity.

Defendant, in moving for summary judgment, contends that the plain language of the IFB required plaintiff to request payment for bentonite and plasticizer as part of its original bid. In the alternative, defendant contends that IFB is patently ambiguous. In the face of the patent ambiguity, according to defendant, plaintiff did not seek clarification.

The parties present the following issues: (1) Did the contract require inclusion of the price of the additives in the bid? (2) Was the contract ambiguous? (3) If so, was the ambiguity patent or latent? (4) If the ambiguity was patent, did plaintiff fulfill its duty to seek clarification?

## DISCUSSION

Pursuant to RUSCC 56, defendant has moved for summary judgment, asserting the absence of genuine issues of material fact and claiming judgment as a matter of law. Recent decisions by the United States Court of Appeals for the Federal Circuit have cast a particularly favorable light on the use of summary judgment.

> Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Federal Rule of Civil Procedure 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources.

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). The Federal Circuit has also stated:

> In contrast to the implications drawn from earlier Supreme Court decisions, summary judgment may no longer be regarded as a disfavored procedural shortcut. Rather, the Court has counseled that summary judgment is a salutary method of disposition "designed to 'secure the just, speedy and inexpensive determination of every action.' "

*Sweats Fashions v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987) (citations omitted).

*United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), requires this court to resolve doubts "in the light most favorable to the party opposing the motion." Because the movant has the burden of showing an absence of factual disputes, this court must defer to the non-movant's version of the facts. *Industrial Indem. Co. v. United States,* 14 Cl.Ct. 351, 355 (1988). Mere denials or conclusory statements, however, are not sufficient to create an evidentiary conflict:

> The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant.

*Barmag Barmer,* 731 F.2d at 836.

### Contract Language

The contract required use of both additives (bentonite and plasticizer) in the cement slurry. The contract, however, did not provide space for a bidder to include the prices per pound of bentonite and plasticizer.

Three solicitation provisions are critical to understanding the role of bentonite in the contract. Section 4.2.3.6 provides:

> It is anticipated that the bentonite additives will be mixed at a rate of about two (2) percent of the weight of the cement. However, the mixing ratios of the bentonite additives shall be at the discretion

of the Contractor and shall be based on the results of test[s] conducted on the construction site.

Section 8.13.2 of the contract states:

Payment for bentonite will be made on the basis of the *bid price* per pound times the number of cubic feet of bentonite actually mixed and injected in the grout holes.

(Emphasis added.) The third provision was the "OPTIONAL" amendment.

Defendant contends that plaintiff should have included the total cost of bentonite under the general heading "Material for Saturation Grouting." This contention is not consistent with other contractual provisions or the circumstances giving rise to this suit. In the first place, the solicitation did not provide space for inclusion of a total bid price for bentonite, either separately or as an element of saturation grouting.

The payment section of the solicitation distinguishes between "Material for Saturation Grouting" and bentonite additive. Payment for "Material for Saturation Grouting" appears in section 8.8. Payment for bentonite additive appears separately under section 8.13.2. Thus, the contract suggests that bentonite does not fit within the general term "Material for Saturation Grouting."

Section 8.13 also provides a method of payment for bentonite incompatible with payment under section 8.8. Section 8.13 states that bentonite payment depends on the amount "actually mixed and injected in the grout holes." Section 8.8 requires bidders to specify total amounts and prices of "Material for Saturation Grouting." These amounts and prices would be unknown prior to contract performance in the case of bentonite. Moreover, other than in the "OPTIONAL" amendment section, the contract did not provide any place for the contractor to specify a bid price for bentonite. The "OPTIONAL" section also requested a per pound, not a total, bid price for the additive, further suggesting that payment depended upon the amount actually used during performance.

Section 4.2.1 of the solicitation discusses the materials which combine to create the grout. These materials include "water, cement, flyash, and sand." Bentonite does not appear until later in the paragraph in connection with the first application of water. The provision discussing the addition of bentonite in "about" a two-percent ratio "at the discretion of the contractor" appears several paragraphs later in section 4.2.3.6. Thus, bentonite is not clearly included with other materials for saturation grouting.

Because the contract was unclear, plaintiff inquired about payment for bentonite. The contract did not contain a bid line item for bentonite. This omission was particularly glaring because this contract provided payment on the basis of a bid price times the amount actually used. Without a specified bid price, this payment formula will not operate.

Adding to the confusion, the prior Willowbend contract had included such a bid item. In this earlier dealing the parties had considered additives separate from other materials for saturation grouting. Payment for bentonite under the earlier contract depended on the amount of additive actually used, not an amount included in the bid prior to performance. The Portercrest and Willowbend contracts contained identical language about "materials for saturation grouting," yet OSM paid for these additives separately under the earlier contract. For these reasons, Mr. Cagnassola sought clarification about payment for additives.

When the absence of a bentonite line item came to the contracting officer's attention, OSM amended the solicitation. Even when amended, the unit price for bentonite appeared under the obscure heading "OPTIONAL—NOT TO BE USED FOR EVALUATION PURPOSES."

Defendant contends that this clause covered optional, as opposed to mandatory, bentonite. The language of the amendment, however, does not suggest that any bentonite was optional. Instead the amendment refers to "Bentonite—delivered, stored, mixed, and pumped into mine

as part of the grout mix." As the contract specifies, bentonite "pumped into mine as part of the grout mix" is not optional, but mandatory. The only optional aspect of the bentonite provision is the ratio of the mix which depends on the discretion of the contractor and tests performed at the construction site.

Construing any disputed facts in favor of plaintiff as required by this motion,[6] this court determines that the contract language did not plainly require inclusion of the costs of bentonite in the original bid. The language of the contract and the circumstances of the bidding process leave unanswered questions about bidding and payment for bentonite.

The contract language reveals similar problems with plasticizer. The contract appears to distinguish between "Materials for Saturation Grouting" and additives, including plasticizer. Section 8.8 refers to payment for materials for saturation grouting, while Section 8.13 refers to payment for "Chemicals for Grout." Under this provision, payment for chemicals controlling the set time of the grout depends on the amount "actually mixed and injected in the grout holes." Once again, the glaring problem is that the solicitation does not provide space for a bid price. The Willowbend contract also paid for plasticizer over and above the bid price on the basis of the amount actually used.

In sum, the contract language is unclear. The contract distinguishes between additives and other materials for saturation grouting in methods of payment. The circumstances of the bid exacerbate the obscurity of the contract language. While some changes in contract language occurred between the Willowbend and Portercrest projects, those changes do not fully explain themselves. The contract language leaves many unanswered questions. OSM employed similar language in two contracts

to express apparently different intentions. Plaintiff contends that it had no notice of those changed intentions. In any event, the contract does not unambiguously require plaintiff to include the cost of bentonite and plasticizer within its original bid price.

### Ambiguity

 These contract provisions are ambiguous.[7] The parties could reasonably interpret these contract provisions and omissions in more than one way. A party could interpret the mandatory use of the additives in contract performance to require inclusion of a price for those components in the original bid. A party could also interpret the omission of a line item for bid prices on these additives to mean that an acceptable bid need not include these items.

The solicitation in section 8.13 noted that the payment for additives would depend on the amount "actually mixed and injected in the grout holes." The price for additives apparently depended on performance of the contract. Therefore, in the absence of clear contract language or contrary instructions, a bidder might reasonably conclude that the parties would establish payment for additives when the amounts were determined by performance.

The language of the "OPTIONAL" amendment was also open to several reasonable interpretations. This language could mean that the unit price for bentonite would not count in evaluating the overall bid price. This reading would allow payment for additives as separate items after contract completion. Alternatively, this amendment could provide payment for optional bentonite beyond the mandatory two percent bentonite mixture.

When a contract provision may be reasonably interpreted in at least two ways, it is ambiguous. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358,

---

6. Defendant contends that the bidders learned OSM's explanation of the contract's meaning at the pre-bid conference. Defendant also contends that plaintiff was on notice of OSM's intent due to a dispute over plaintiff's claim for additional payment for plasticizer on the Willowbend contract. Plaintiff contests these facts.

If, however, defendant can prove its assertion at trial, plaintiff may have been on notice of OSM's intentions before bidding.

7. Both parties agreed that the contract language is not "a model of clarity." Tr. at 9, 16, 22, 28.

372, 393 F.2d 807, 815–16 (1968); *Bennet v. United States*, 178 Ct.Cl. 61, 64–65, 371 F.2d 859, 861 (1967); *XXX Constr. Co. v. United States*, 16 Cl.Ct. 491, 495 (1989). When contract language is ambiguous, the court may look to the conduct of the parties and the circumstances of the transaction for clarification. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 514, 455 F.2d 1037, 1044 (1972); *XXX Constr.*, 16 Cl.Ct. at 495. To properly interpret ambiguities, the court may place itself in the shoes of a reasonable and prudent construction contractor or at least in the position of a reasonably intelligent person acquainted with the contemporary circumstances. *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *Hegeman–Harris & Co. v. United States*, 194 Ct.Cl. 574, 589, 440 F.2d 1009, 1016 (1971); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 976 (1965); *John C. Grimberg Co. v. U.S.*, 7 Cl.Ct. 452, 456, *aff'd mem.* 785 F.2d 325 (Fed.Cir.1985).

The Portercrest IFB, as originally issued, did not contain a bid line item for bentonite whereas its predecessor, the Willowbend contract, had a separate bid item. This difference prompted the plaintiff to contact defendant concerning this omission. The result was the "OPTIONAL" amendment to the Portercrest IFB requesting a unit price (price per pound) for bentonite. The amendment did not request a total bid for bentonite, suggesting that payment indeed depended on the amount mixed and injected. Plaintiff could reasonably interpret this amendment as providing payment in the Portercrest contract the same as in the prior Willowbend contract.

OSM paid for plasticizer as an item separate from the bid in the Willowbend contract. The Portercrest contract provided for payment for chemical additives, apparently including plasticizer, on the basis of the amount mixed and injected. Yet, the contract provided no place for the bidder to list a unit price or total bid price on plasticizer. Thus, plaintiff could reasonably interpret the Portercrest language, although changed from the Willowbend contract, to provide payment in the same way.

In light of the IFB language and the bidding circumstances, the Portercrest IFB was ambiguous. With respect to both bentonite and plasticizer, the Portercrest IFB does not clearly provide for a method of payment or bidding.

### Patent Ambiguity

After finding an ambiguity in the contract language, this court must decide whether that ambiguity was patent or latent. Thus, this court's determination may give rise to a duty to seek clarification. The doctrine of patent ambiguity is an exception to the *contra proferentem* rule which requires that the contractual language be construed against the drafting party. *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501 (1963); *American Bankers Life Assur. Co. of Florida v. United States*, 12 Cl.Ct. 166, 173 (1987).

The Claims Court's predecessor cautioned against resolving an ambiguity against the drafter if the ambiguity is so patent and glaring that the contractor should have reasonably sought clarification. *J.A. Jones Constr. Co. v. United States*, 184 Ct.Cl. 1, 11–13, 395 F.2d 783, 789–90 (1968); *Chris Berg*, 455 F.2d at 1044 (1972). The Court of Claims stated:

The analytical framework for cases like the instant one was set out authoritatively in *Mountain Home Contractors v. United States*, [192 Ct.Cl. 16, 425 F.2d 1260 (1970)]. It mandated a two step analysis. First the court must ask whether the ambiguity was patent. This is not a simple yes-no proposition but involves placing the contractual language at a point along a spectrum: Is it *so* glaring as to raise a duty to inquire? Only if the court decides that the ambiguity was not patent does it reach the question whether a plaintiff's interpretation was reasonable. The existence of a patent ambiguity *in itself* raises the duty of inquiry, regardless of the reasonableness *vel non* of the contractor's interpretation.... The court may not consider the reasonableness of the contractor's

interpretation, if at all, until it has determined that a patent ambiguity did not exist.

*Newsom v. United States*, 230 Ct.Cl. 301, 304, 676 F.2d 647, 650 (1982) (emphasis in original). The principle of construing a discrepancy against a bidder who fails to clarify a glaring inconsistency wisely limits the *contra proferentem* doctrine. The Court of Claims stated:

> The rule that a contractor, before bidding, should attempt to have the Government resolve a patent ambiguity in the contract's terms is a major device of preventive hygiene; it is designed to avoid just such post-award disputes as this by encouraging contractors to seek clarification before anyone is legally bound.

*S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 131, 546 F.2d 367, 370–71 (1976); *Robert L. Guyler Co. v. United States*, 219 Ct.Cl. 403, 593 F.2d 406, *cert. denied*, 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 55 (1979).

More recently the Claims Court agreed:

> It is well established that in cases involving patent ambiguities in Government contracts, the plaintiff incurs an obligation to request clarification of the perceived contractual inconsistency and attempt to alleviate it before contracting.

*American Bankers*, 12 Cl.Ct. at 173.

The Court of Claims clarified that it is not the actual knowledge of the contractor, but the obviousness of the discrepancy which imposes the duty of inquiry. *J.A. Jones Constr.*, 395 F.2d at 789–90. Even if it reasonably interprets the contract, the contractor is still bound by those cases which hold that he must inquire into obvious omissions or inconsistencies in the provisions. Therefore, a contractor's interpretation cannot be reasonable if the ambiguity is obvious. *Jamsar, Inc. v. United States*, 194 Ct.Cl. 819, 826–27, 442 F.2d 930, 934 (1971). Indeed, saying that a contractual provision contains a patent ambiguity is tantamount to saying that the contractor cannot make a reasonable interpretation unilaterally. *Brezina Const. Co. v. United States*, 196 Ct.Cl. 29, 34–35, 449 F.2d 372, 375 (1971).

As policy reasons for aggressively imposing the duty to inquire, this court endorses those stated in *Enrico Roman Inc. v. United States*, 2 Cl.Ct. 104, 107 (1983), and *S.O.G.*: (1) the need to protect bidders so that they are all bidding on the same material; (2) to discourage contractors from taking advantage of the Government (by deterring a bidder who knows or should know of a serious problem in interpretation, from consciously taking the award with a lower bid—based on a less costly reading) with the expectation that they will then be able to say "change" or "extra" if the procuring officials take the other view after the contract is made; and (3) to prevent post-award litigation. *Roman*, 2 Cl.Ct. at 107; *S.O.G.*, 546 F.2d at 371.

The ambiguity in the Portercrest IFB was patent and glaring. The "OPTIONAL" amendment did not clarify the bentonite problem pointed out by Mr. Cagnassola, but created more ambiguities. For instance, was a total bid for bentonite required when the IFB only provided space for a unit price? What did "Not for evaluation purposes" mean? What did the heading, "OPTIONAL" mean—that additional bentonite beyond contract requirements was optional, or that including bentonite in the bid was optional?

In view of the IFB's payment provisions and prior dealings under the Willowbend contract, the initial lack of a line item in the Portercrest contract (and the subsequent addition of an unclear section) required plaintiff to seek further clarification about payment for bentonite. This court additionally emphasizes:

> [T]he negligible time and the ease of effort required to make inquiry of the contracting officer compared with the costs of erroneous interpretation, including protracted litigation. While the court by no means wishes to condone sloppy drafting by the Government, it must recognize the value and importance of a duty of inquiry in achieving fair and expeditious administration of Government contracts.

*Newsom*, 676 F.2d at 651.

Although plaintiff argued that one effort to seek pre-bid clarification of the contract

language satisfied its duty, the contractor must in the face of a glaring ambiguity seek further clarification before bidding. In this case, OSM's response to plaintiff's first inquiry about bentonite compounded the ambiguity. The "OPTIONAL" amendment created more questions than it answered. Therefore, plaintiff, who recognized the problems, had an obligation to seek further clarification.

The Claims Court, in *Roman*, granted defendant's motion for summary judgment because plaintiff failed to affirmatively seek complete clarification of a patent ambiguity prior to bidding. As in the case at bar, plaintiff informed the Government of an ambiguity in the bid solicitation. The Government amended the solicitation, but did not resolve the ambiguity. Although it had initially inquired about the patent ambiguity, plaintiff failed "to have the government resolve a patent ambiguity in the contract's terms" before bidding. *Roman*, 2 Cl.Ct. at 107 (citations omitted).

In another analogous decision, the Claims Court in *Sofarelli Assocs. v. United States*, 1 Cl.Ct. 241 (1982), *appeal dismissed*, 716 F.2d 1395 (Fed.Cir.1983), ruled that plaintiff had a duty to clarify because it knew of the ambiguity in the contract prior to submitting its bid. Plaintiff contracted to construct facilities at Camp Lejeune, North Carolina. Before bidding, plaintiff requested from the Government amendments to the specifications and drawings. The Government assured plaintiff that it would issue an amendment. The amendment, however, did not answer plaintiff's questions definitively. Plaintiff bid anyway, later claiming additional payment for work the amendment did not clearly address. The Claims Court held that the specifications and drawings were ambiguous and that plaintiff's failure to seek further clarification precluded recovery.

In another relevant case, the Government's IFB contained a schematic diagram of the proposed project with the notation "schematic and for the purpose of estimating only"—similar to the "OPTIONAL" language in the Portercrest IFB. *S.O.G.*, 546 F.2d at 368. Plaintiff formulated its own plan for the project, disregarding the diagram, believing that the diagram was not mandatory and that its own interpretation was reasonable. The Government rejected plaintiff's plan and demanded compliance with the diagramed plan at an additional cost of $2 million.

The court stated that this case presented "another example of a contractor who, faced with a patent ambiguity in Government bid documents, did not meet his responsibility to have the ambiguity resolved before bidding." *Id.* at 369. The court stated:

> [A] knowledgeable bidder, as S.O.G. admittedly was, should have recognized at once that there would be a grave problem as to whether its proposed diversion plan conformed with the IFB.

*Id.* at 370.

In the present case, the inconsistency was particularly obvious. Plaintiff knew that some language of the Portercrest IFB was different from the prior contract. By admission of Mr. Cagnassola, plaintiff knew that the Portercrest contract contained no line item for bentonite, nor for plasticizer. Without bid prices for the additives, the payment formula in the contract would not work. Section 8.13 computed payment for the additives by multiplying the bid price times the amount actually mixed and injected. The "OPTIONAL" amendment compounded the problem. Given the obvious nature of the ambiguity, plaintiff had a duty to clarify before bidding.

■ Plaintiff alleges, in an affidavit filed after argument, that it satisfied this legal duty. Plaintiff first raised questions after the pre-bid conference which resulted in the "OPTIONAL" amendment. Plaintiff also alleges that it contacted the contracting officer after issuance of the ambiguous amendment. Plaintiff asserts that OSM refused to clarify the ambiguity. Apparently plaintiff sought full clarification before bidding only to have OSM refuse to provide its interpretation of the disputed language. Apparently plaintiff did all within its power to fulfill its duty to clarify. In the context of defendant's motion for

summary judgment, this court must give appropriate deference to the detailed declaration of plaintiff's knowledgeable affiant. For this reason, this court denies defendant's summary judgment motion. This recent affidavit shows, at least in the context of this motion, that plaintiff did all within its power to satisfy its duty to clarify the patent ambiguities.

Furthermore, this court intends to offer the parties the opportunity to resolve any factual disputes raised by this motion. In particular, this court orders the parties to prepare for a trial on the question of whether plaintiff met its duty to clarify patent ambiguities prior to bidding.

The contract ambiguities concerning payment for additives are particularly glaring. Moreover, plaintiff knew of these ambiguities before it submitted its bid. Plaintiff's knowledge prompted two inquiries about the ambiguities. Because it had this knowledge, plaintiff was required to seek clarification from the contracting officer.

*James A. Mann, Inc. v. United States*, 210 Ct.Cl. 104, 123, 535 F.2d 51, 61 (1976). If at trial the evidence shows that plaintiff fully responded to this heavy obligation and that OSM refused to clarify its intentions, plaintiff will prove its case. If at trial the evidence shows that plaintiff did not fully respond to this obligation before preparing its bid, defendant will prove that plaintiff voluntarily assumed the risk of an incorrect interpretation. *Jamsar*, 442 F.2d at 935.[8]

### Binding Interpretation

■ This court's trial of the few remaining issues in this case will not focus solely on plaintiff's duty to clarify patent ambiguities. While plaintiff has a high duty to clarify an ambiguity as glaring as this case presents, this is not the sole question left unanswered by this motion. If plaintiff knew or should have known of OSM's reasonable interpretation of the ambiguous

---

**8.** A contractor also "proceeds at his own risk and expense" when he does not comply with the duty to inquire imposed by contract provisions which require the submittal of detected discrepancies to the contracting officer. *Mann*, 535 F.2d at 61; *Beacon*, 314 F.2d at 504; *Jefferson Constr. Co. v. United States*, 176 Ct.Cl. 1363, 1369, 364 F.2d 420, 423 (1966), *cert. denied* 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967). The purpose of this type of contractual provision is to enable and obligate potential contractors to clarify the contract's meaning before the die is cast. *Beacon*, 314 F.2d at 504.

The Portercrest contract contains provisions which emphasize the fact that plaintiff has an independently-based duty to inquire on any matter relating to the terms of the contract, without the necessity of showing patent ambiguity or incipient problems. The Portercrest provision provides:

2(d)—On all matters that pertain to the contract terms, the contractor must communicate with the Contracting Officer. Whenever, in the opinion of the contractor, the COR/TPO [Contracting Officer's Representative/Technical Project Officer] requests effort outside the scope of the contract, the contractor shall so advise the COR/TPO. If the COR/TPO persists and there still exists a disagreement as to proper contractual coverage, the Contracting Officer shall be notified immediately by the Contractor, preferably in writing if time permits. Proceeding with work without proper contractual coverage could result in non-payment or necessitate submittal of a contract claim.

Portercrest IFB, Special Contract Requirements, Section 2(d). This is one more area in which the Willowbend contract has proved to have been much clearer. The analogous provision in the Willowbend IFB (Section 52.214-6) was taken directly from the Federal Acquisition Regulations and stated:

Any prospective bidder desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective bidders before the submission of their bids. Oral explanations or instructions given before the award of a contract will not be binding. Any information given a prospective bidder concerning a solicitation will be furnished promptly to all other prospective bidders as an amendment to the solicitation, if that information is necessary in submitting bids or if the lack of it would be prejudicial to other prospective bidders.

Although this provision is much more direct than the Portercrest provision, the Portercrest clause is sufficiently clear so as to show an independent basis for plaintiff's duty to inquire. Thus, in addition to the duty to inquire which plaintiff bears as a result of the finding of patent ambiguity in the contract and from the finding that plaintiff had separate notice of incipient problems regarding contract interpretation, the Portercrest IFB language additionally fortifies the position that plaintiff had a duty to seek clarification in this case.

provisions, that knowledge would bind plaintiff to OSM's interpretation. The Court of Claims stated this rule in *Cresswell v. United States*, 146 Ct.Cl. 119, 173 F.Supp. 805 (1959):

> If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended.

*Id.* at 127, 173 F.Supp. at 811–12. The Court of Claims additionally stated:

> A previous contract already performed and already interpreted is strong evidence of the parties interpretation of the disputed contract.

*Id.* (citations omitted). This rule has been applied consistently by the Claims Court and its predecessor. *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315 (1970); *Sun Shipbuilding*, 183 Ct.Cl. at 376–77; *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988).

Plaintiff alleges that it had no knowledge of controversy surrounding the change order in the Willowbend contract. To the extent that plaintiff knew of OSM's disapproval of paying for the additives separately after performance, this knowledge might inform its understanding of the changes made in the Portercrest contract. Further plaintiff alleges that OSM did not inform it that the cost of the additives must be included in the original bid. Defendant insists that it provided this information at the pre-bid conference attended by plaintiff. To the extent plaintiff knew of OSM's intention to have additive costs included in the original bid, plaintiff would be bound by that knowledge.

If plaintiff was, or should have been, on notice of OSM's interpretation of the contract language, that notice would bar plaintiff's recovery. Accordingly, this will be another narrow issue to be examined in the trial tailored to resolve the few remaining questions.

## CONCLUSION

Genuine issues of material fact prevent this court from granting defendant's motion for summary judgment. In particular, the parties dispute whether plaintiff knew or should have known of OSM's interpretation of the contract and whether plaintiff fully met its duty to clarify patent ambiguities. Thus, this court denies defendant's motion for summary judgment.

This motion, however, has served to narrow and focus the issues for trial. This court directs the parties to prepare for a trial on the narrow questions of whether plaintiff knew or should have known of OSM's interpretation of the ambiguous language and whether plaintiff satisfied its duty to clarify.

IT IS SO ORDERED.