**MAINTENANCE ENGINEERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 387–89C.**

United States Claims Court.

Oct. 4, 1990.

Janet Irons, Seattle, Wash., for plaintiff.

William K. Olivier, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M.

Gerson, for defendant. Ellen M. Evans, Office of Naval Facilities, of counsel.

## OPINION

### NETTESHEIM, Judge.

This case is before the court after trial. Plaintiff seeks recovery on a government contract claim for increased costs and expenses associated with its performance of a grounds maintenance contract. Defendant takes the position that the doctrine of patent ambiguity bars plaintiff from recovering for extra work when plaintiff should have alerted the Government, before award, that the contract drawings contained a glaring error in the size of the grounds to be maintained.

## FACTS

On March 17, 1986 the Department of the Navy, Naval Facilities Engineering Command ("NAVFAC"), awarded Maintenance Engineers, Inc. ("plaintiff"), Contract No. 85–C–1807 to perform grounds maintenance services at the Oak Knoll Naval Regional Medical Center (the "hospital"), Oakland, California. The hospital's terrain is hilly, with numerous ravines running throughout the grounds. By standing at a point on the base in front of the Senior Officers' Quarters, one can look out and see most, if not all, of the hospital grounds.

Plaintiff is a successful corporation based in West Los Angeles, California, having engaged in business as a grounds maintenance contractor for roughly 30 years. Currently, it employs approximately 100 employees throughout the western United States. Since 1980 grounds maintenance contracts have been the exclusive source of business for plaintiff, with 95 percent of these contracts involving the military.

Contract No. 85–C–1807 was a combination "Fixed-price Lump Sum" and "Indefinite Quantity Work" grounds maintenance contract awarded to the overall lowest bidder. The fixed-price portion of the contract covered recurring work performed on a monthly basis. The indefinite quantity portion of the contract covered sporadic, specially requested services. These two portions were bid separately by the prospective contractors and then totalled by NAVFAC to determine the apparent low bidder. The contract required plaintiff to perform such tasks as lawn mowing, trimming, edging, cleaning up debris, watering, pruning, aerating, fertilizing, applying pesticides, and controlling weeds on the hospital grounds. The contract's performance period began on April 1, 1986, and continued for one year through March 31, 1987.

Plaintiff's bid for the contract's fixed portion was $152,400.00, and its bid for the indefinite quantity portion of the contract was $6,120.00. After NAVFAC totalled these two bids, plaintiff was the apparent low bidder.[1] Contract modification P00003 extended the original contract for a six-month period, from April 1, 1987, to September 30, 1987, at an additional cost to NAVFAC of $76,200.00. Subsequently, contract modification P00007 lengthened the contract by another six-month period, from September 30, 1987, to March 31, 1988, at an additional cost to NAVFAC of $77,942.34. Plaintiff claimed damages based on a third six-month extension, but no evidence was introduced identifying the duration or amount of the modification.

Required work under the contract was not uniform throughout the hospital grounds. Rather, the required work varied by area according to its classification, as set out in three drawings of the hospital grounds and in an accompanying legend to drawing no. 6256164. The drawings consisted of maps of the grounds, unique number designations for individual work areas, and different "hatching" patterns keyed to numbered areas representing the several general categories of contract work areas. The legend on drawing no. 6256164 further explained these work areas and defined them as follows: 1) The "200 area" depicted the housing areas consisting of 65,000 square feet; 2) the "300 area" symbolized

---

1. However, another contractor was the low bidder solely on the fixed-price portion, having bid only $147,556.00.

the developed areas containing 845,000 square feet; 3) the "400 area" embodied the fire break areas totalling 217,000 square feet; and 4) the "500 area" represented the semi-improved weed and grass area which, according to the legend, contained 167,000 square feet. However, the legend was incorrect regarding the amount of square footage in the 500 area. The 500 area actually contained 1,886,000 square feet, not 167,000 square feet as indicated in the legend.[2] The drawings did not designate any areas as "100 areas", but did include an unnumbered area, with its own hatching pattern, described as "undeveloped areas not in the contract." The terrain of the 500 area had steep inclines and slopes, thereby prohibiting most large machinery from operating in it. The work conducted in the 500 area was extremely labor intensive, with most (estimated by plaintiff's president as 85 or 90 percent) of the work done by hand. Although the contract called for work to be performed on all areas, the present claim concerns only the fixed-price work in the 500 area.

Plaintiff's bid of $152,400 was $86,050 below NAVFAC's estimate of $238,450. NAVFAC contracting personnel became concerned that the bid's low price might cause plaintiff's employees to go unpaid. Consequently, before awarding the contract, NAVFAC requested a bid verification meeting with a representative of plaintiff, at which the contractor was to provide assurances to NAVFAC that the work would be accomplished for the bid price and that plaintiff understood the work involved. NAVFAC requested that certain documents, such as work sheets and a detailed estimate of costs, be furnished at the meeting.

The meeting took place on March 7, 1986. As preparation for the meeting, Bradley Lee Herman, plaintiff's President, reviewed the bid, checked the mathematics, and discovered no errors. At the meeting there was no discussion of the square footage involved. The conversation concerned mainly price. One of NAVFAC's representatives, Gwendolyn Adams–Kyles, expressed NAVFAC's concerns to Joel Herman, who represented plaintiff at the meeting. In response Joel Herman stated that he understood the work involved, that his bid was firm, that plaintiff would realize a profit on the contract, and that he would send NAVFAC a letter verifying plaintiff's bid. The contractor mailed such a confirming letter, signed by Bradley Herman, on that same day. The letter stated that after review of the bid, no error was found. The only information provided by Joel Herman at the meeting was a breakdown of the number of men to be used each month. Joel Herman presented this information orally.

Immediately following the meeting, NAVFAC decided to award plaintiff the contract. Its decision was based on such factors as Joel Herman's insistence that the job could be done at the price bid, his ability as a salesman, his contacts with the Government, plaintiff's experience, and the fact that plaintiff already owned the majority of the equipment required for the job.

On March 26, 1986, a pre-work conference was held. The participants, which included NAVFAC's Patricia Ann Ward and Joel Herman, discussed mainly administrative matters, such as insurance, phone numbers, and the identity of the site supervisor. While in attendance, Joel Herman stated that he believed there might be an error in the 500 area's square footage. No action regarding this possible discrepancy was undertaken by either plaintiff or NAVFAC at this time.

Immediately prior to the start of performance, Michael P. Krieg, plaintiff's Project Manager on its nearby Treasure Island contract, conducted a detailed study of the hospital grounds with a NAVFAC inspector to determine what areas the contract covered and what work had to be done. From this visit, Mr. Krieg formed an impression that there might be a large error in the square footage of the 500 area

---

**2.** At first, NAVFAC thought the error was merely clerical, in that the square footage should have read 1,167,000 square feet, not 167,000 square feet. However, after completion of new measurements, NAVFAC learned the 500 area's correct square footage, in fact, was 1,886,000.

as shown on the legend. He then informed Bradley Herman of his concern. In response Bradley Herman instructed Mr. Krieg to check with the contract officer again and to wait see what actually happened once the job started.

Contract work began as scheduled on March 31, 1986. Soon after, Bradley Herman noticed first that the amount of labor actually expended on the 500 area far exceeded the predicted amount for that area and, second, that work on each individual area was taking longer than anticipated. As a result, he increased the man-hours for the 500 area by hiring additional workers so that the work could be completed as scheduled. These events caused Mr. Herman to believe that an error existed in the square footage of the 500 area as listed in the legend.

Plaintiff first served written notice to NAVFAC of a discrepancy in the size of the 500 area by a letter dated July 28, 1986. The letter requested that plaintiff be provided with a detailed breakdown of the square footage and granted a change order to reflect the additional square footage. NAVFAC provided such a change order on September 4, 1986. This change order did not result in a contract price increase.

In an October 2, 1986 letter, plaintiff first alerted NAVFAC that it was incurring costs in excess of its bid price on the 500 area. Specifically, the contractor stated that its increased expenses were due to the unexpected eleven-fold increase in square footage of the 500 area reflected in the change order over that specified in the legend. Plaintiff cited an unanticipated increase in man-hours required to complete the grass and weed mowing, controlling

weeds, pruning, and trimming as the cause of its enlarged expenses. In a letter dated December 23, 1986, the contractor provided a detailed breakdown of man-hours used on the 500 area. After subtracting the amount of money listed in the schedule of deductions[3] for the 500 area from the amount of money actually spent on that area, plaintiff calculated a claim amount of $81,468.05 for the initial year of the contract. Plaintiff computed this figure by subtracting the schedule of deductions figure for the 500 area, or $65,592.00, from the total actual costs incurred in that area for the first year of the contract. This December letter did not include a certificate of claimed amount.

In an October 18, 1988 letter, plaintiff submitted a certified claim for the initial year of the contract in the amount of $81,-468.05. Since the contract's length eventually expanded to included three option periods for an additional year and one half, the contractor claimed an additional $81,-468.05 for the first two option periods of six months each and half that amount for the third option period of six months, for a total claim of $203,670.12.[4]

NAVFAC denied the contractor's claim on October 24, 1988. The first reason for the denial was that a comparison of plaintiff's current bid with its previous bids led NAVFAC to conclude that if the actual square footage of 1,886,000 had been used, the bid rate per square foot would be in the high range of the contractor's bids. However, using the 167,000 square foot figure, the $152,400.00 bid price could only have been reached if the contractor employed a bid rate per square foot significantly higher than that of any previous bids on what

---

**3.** Generally, a "schedule of deductions" is a document representing a negotiated agreement between a contractor and the appropriate government entity concerning the value of work to be done on the contract, broken down by area or job. Specifically, for this contract, the schedule of deductions was a breakdown of work requirements by specific area number, *e.g.,* 301, 408, 519, etc.; month; and frequency of performance. These figures were used to arrive at a cost of performance for each individual area. As an example, the schedule of deductions stated that area 503 would be worked on a total of

16 times during the first year of the contract and that the value for such work was $1,504.00.

The schedule serves as a ready means by which the government agency can deduct the value of any work not performed from subsequent payment to the contractor.

**4.** At trial plaintiff made claims for the contract and the option years. The court ruled that plaintiff's complaint was deemed amended to correspond to the proofs. Plaintiff had submitted a certified claim to the contracting officer covering the option periods.

NAVFAC considered to be similar contracts. Thus, NAVFAC concluded that the contractor was not misled by the square footage error in the 500 area. Second, NAVFAC stated that the vast discrepancy between the area set forth in the legend and the actual area observed prior to awarding the contract created a duty to inquire on the part of the contractor when it noticed the error. Since there was a breach of such duty, plaintiff did not deserve a contract price adjustment. Finally, NAVFAC claimed that the contractor was unable to prove additional costs for the option periods.

Bradley Herman prepared 99.9 percent of the bids submitted by plaintiff. He testified that his general bid preparation procedure consisted of, first, obtaining information concerning upcoming contracts, which was brought to his attention largely through subscriptions such as *Commerce Business Daily*, a United States Department of Commerce publication. Second, if interested, Mr. Herman would send away for a bid package, which contained information concerning the contract's requirements and specifications. Mr. Herman would next review the packet to see if it outlined a contract that was practical for his company to bid on. Then, if he decided to submit a bid, Mr. Herman would go to the site and inspect it in order to determine manpower, equipment, and other needs. Mr. Herman made it his practice not to participate in the formal, government-conducted site tour, but, rather, conducted his own tours, generally without the assistance or advice of any military personnel. He explained that in his view the formal tours were too confusing and ambiguous, in that prospective contractors raised too many questions that were left unanswered by the Government. Mr. Herman would then mentally calculate the bid price by considering such factors as the slope of the terrain, the amount of

man-hours required, and the quantity of land involved.[5]

For this specific contract, Mr. Herman utilized the above procedure, with several refinements. After receiving the bid solicitation package, he reviewed the mowing requirements in order to visualize what services plaintiff would perform. Mr. Herman then testified:

> I would have looked ... throughout the rest of the contract for idiosyncracies or differences in this contract and other Navy contracts or other things we do. Then I would take the various square footages, ... convert them to acreages, and make a rough calculation as to what our bid would be. Then I would make my site visit from there.

Before submitting his bid, Mr. Herman conducted his own private three-hour site tour, both in his car and on foot, and did not ask any questions of Navy contracting personnel. In terms of the percentage of the base actually traversed by him, the witness stated: "I cannot honestly say that I went to every area. I went to almost all of the areas. I would look at them and I'd go back and back, back over each one of the areas." Mr. Herman did go to the Senior Officers' Quarters where he was able to view most of the base from one vantage point. From that position he testified that he could not easily differentiate between the 500 areas and those unnumbered areas not within the contract, in most instances. While on base he had with him the drawings, including the legend. Beside the legend, adjacent to the entry quantifying the 500 area as containing 167,000 square feet, Mr. Herman made a handwritten entry of "4", signifying four acres, which is a rough approximation of the square footage listed in the legend. The true size of the 500 area, 1,886,000 square feet, is approximately equal to 40 acres.

---

**5.** Equipment size utilized in a semi-improved area varies from a 20-foot wide tractor drawn mower to a hand-held "Greens Machine," a device that cuts weeds with a spinning nylon cord. The tractor drawn mower could cut 80 to 90 acres of level land in one day. If the terrain was very steep, the "Greens Machine" might cut only one acre a day.

With regard to semi-improved "500 type" areas, Mr. Herman prepared his bid by first determining what equipment, if any, the contractor could use in the area. He based this decision on whether the base contained numerous small areas and whether there were any obstacles, such as trees, buildings, or hills.

Mr. Herman also carried with him on his site tour a sheet of paper on which he made notes as his tour progressed. On this sheet of paper, Mr. Herman indicated the type of work to be done, such as trimming or watering; the type of worker to be used, either a laborer or an operator; and the amount of man-hours expected to be used for each type of work. Mr. Herman estimated in his notes that 20.1 "man/months" [6] would be sufficient to complete work on the 500 areas.

After its claim was denied, plaintiff filed suit in the Claims Court on July 11, 1989, advancing several grounds for recovery. First, plaintiff asserted detrimental reliance on the bid documentation provided by NAVFAC. Second, it contended that the Navy was unjustly enriched by receiving extra services without making payments to the contractor. Third, plaintiff argued that, on theories of either unilateral or mutual mistake, it should receive an award based on quantum meruit. Next, the contractor argued that NAVFAC's negligent misrepresentation of the square footage in the 500 area caused damage to plaintiff.[7] Finally, plaintiff asserted that NAVFAC breached the contract by requiring the contractor to provide services on the extra 1,719,000 square feet. Defendant responded by asserting the affirmative defenses of patent ambiguity, estoppel, and waiver.

## DISCUSSION

### 1. *Patent ambiguity*

 Initially, this court must " 'ascertain analytically whether *vel non* an ambiguity existed' " in the disputed contractual provisions. *John C. Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456 (1985) (quoting *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 106 (1983)), *aff'd mem.* (Fed.Cir.1986) (unpubl.). Contract interpretation, including its specifications, plans

and drawings, is a matter the court must resolve. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir.1984). An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983)). A contract is ambiguous if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968).

 An ambiguity exists in this case. The legend on drawing no. 6256164 stated that the 500 area consisted of 167,000 square feet, or roughly four acres. Actually, the area depicted in the drawings was much greater than and could not correspond to four acres (the correct size of the 500 area totalling 1,886,000 square feet, or about 40 acres). The square footage listed in the legend was thus inaccurate by a factor of eleven. To this extent the contract was ambiguous.

 Once an ambiguity is found to exist, the issue becomes whether the disputed provisions were patently ambiguous at the time of contracting. If they were, a duty then arises on the non-drafting party to inquire as to their meaning. *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir.1988). Thus, if differing constructions of the contract's plain meaning are plausible, the court must inquire whether such a discrepancy would be apparent to a reasonably prudent contractor. *John G. Grimberg Co. Inc.*, 7 Cl.Ct. at 456. Reasonableness is the standard. Contractors must inquire only as to major omissions, obvious discrepancies, or manifest conflicts in contract provisions. *WPC Enter., Inc. v. United States*, 163 Ct.Cl. 1,

---

**6.** "Man/months" represents the amount of hours one man can work per month. Mr. Herman testified that "40 percent of a man month ... actually correlates down to two days every week [of the month].... [T]wo days a week is 40 percent of the month." By extrapolation there are 160 man-hours for every four work weeks, or roughly 160 man-hours in every man/month.

**7.** *See infra* note 10.

6, 323 F.2d 874, 877 (1963). As the Court of Claims stated in *Wickham Contracting Co., Inc. v. United States*, 212 Ct.Cl. 318, 323–24, 546 F.2d 395, 398 (1976):

> Under circumstances where a patent and glaring discrepancy exists in a contract drawing, and such a discrepancy would be recognized by a reasonable bidder, there is a burden imposed on such bidder to seek a clarification ... before submitting a bid, if the bidder, subsequent to an award to it, hopes to rely on its unilateral resolution of the discrepancy issue as a basis for a subsequent contract price adjustment claim. *Merando, Inc. v. United States*, 201 Ct.Cl. 23, 475 F.2d 601 (1973); *Space Corp. v. United States*, 200 Ct.Cl. 1, 5–6, 470 F.2d 536, 539 (1972); *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963)....

A patent ambiguity is defined inexplicitly as an ambiguity that is " '*so* glaring as to raise a duty to inquire.' " *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987) (emphasis in original)). When resolving whether a contract is patently ambiguous, "the language must be placed at a point along a spectrum of ambiguity...." *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (citation omitted).

■ It is not the contractor's actual knowledge, but the obviousness of the inconsistency that imposes the duty to inquire. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972). "This proposition is for application in situations where a bidder knew, as well as in situations where a bidder should have known, of the discrepancy...." *Wickham*, 212 Ct.Cl. at 324, 546 F.2d at 398. A contractor's failure to comprehend an obvious ambiguity in no way excuses its affirmative duty of inquiry. *Carothers Constr. Co., Inc. v. United States*, 20 Cl.Ct. 556, 560 (1990) (citing *J.A. Jones Constr. Co. v. United States* 184 Ct.Cl. 1, 395 F.2d 783 (1968)). The contractor bears the burden of inquiry in order to avoid complex and expensive litigation. *Id.* (citing *J.B. Steel,*

*Inc. v. United States*, 810 F.2d 1139, 1141 (Fed.Cir.1987)); *Beacon Constr. Co. of Mass. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963). Additionally, the principle of patent ambiguity deters a "bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid ... with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials...." disagree with the contractor's interpretation. *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 131, 546 F.2d 367, 371 (1976).

■ In this case a comparison of the figure of 167,000 square feet in the legend and the actual size of the 500 area depicted on the three drawings compels a conclusion that the drawings, including the legend in no. 6256164, were patently ambiguous. Bradley Herman spent roughly three hours on his site tour in which he drove and walked around almost all areas of the hospital grounds. He went back over some areas in an attempt to accurately grasp the work required under the contract. Mr. Herman also had with him the three drawings depicting the hospital grounds, including drawing no. 6256164 with its erroneous legend. Adding the legend's total square footage for each area category, the size of the hospital grounds would equal 1,294,000 square feet. The 500 area, listed at 167,000 square feet, would constitute 12.9 percent of this total area. However, using the correct 500 area size of 1,886,000, the total size of the hospital grounds would equal 3,013,000 square feet. Of this total, the 500 area would comprise 62.6 percent of the hospital grounds.

While acknowledging that these percentages can only be calculated with the benefit of knowing the correct size of the 500 area, they nonetheless give dimension to the 500 area and its relationship to the rest of the hospital grounds. The court has reviewed the drawings depicting the 500 and other areas with particular attention to drawing no. 6256164, containing the erroneous legend. Although the cross-hatching is not pristine, the court construes the three drawings, from the point of view of a rea-

sonable contractor, to reflect the 500 areas as exceeding the size of the 300 area, which represents 845,000 square feet, or 17 acres. Contrary to plaintiff's assertion, none of the drawings confuses "undeveloped areas not in contract" with the 500 areas. The error was conspicuous and obvious and could not be ignored by any reasonable government contractor. The magnitude of error was 1,719,000 square feet, or 49.7 percent.

*T.G. Gardner, Inc.*, ASBCA No. 26224, 85–1 B.C.A. (CCH) ¶ 17,823, 1984 WL 13888 addresses an issue similar to the one presented. In *Gardner* a discrepancy existed between the estimated area specified by the Government and the actual area observed by plaintiff in its site inspection, to the magnitude of 600 square feet versus 49,600 square feet. As a result of this inspection, plaintiff actually became aware "that the estimated quantities covered under [the] bid ... varied from the actual quantities." *Id.* at 89,204. The contractor, a knowledgeable bidder, failed to inform the Government of this discrepancy. The magnitude of the conflict created a duty to inquire and the breach of such duty foreclosed recovery.

Admittedly, Bradley Herman did have with him on his site inspection a copy of the legend on which he wrote "4" by the square footage of the 500 area. However, it would be most unusual and unreasonable for an experienced grounds maintenance contractor, such as Mr. Herman, to make a site inspection, with the drawings and inaccurate legend in hand, and neither notice the vast discrepancy between the size of the 500 area listed in the legend and the size of the 500 area actually present before him on the hospital grounds, nor ask any questions of any NAVFAC personnel. Under the guidelines of *Fort Vancouver Plywood Co.*, 860 F.2d at 414, the ambiguity was glaring and, consequently, a duty to inquire existed.

This conclusion finds support in the testimony of defense witness Andy Bill Shubin, who qualified, without objection, as an expert witness in government grounds maintenance contracts and bidding practices on government contracts. Mr. Shubin is the President and co-owner of ALS Services, a grounds maintenance contracting company which at present holds the contract for grounds maintenance at the hospital. Mr. Shubin stated that, if he had bid on the same contract at issue in this case, he would not have discovered the legend's error regarding the size of the 500 area merely by viewing the drawings. The witness justified this view by stating that "[i]t's just something that I would take for granted that is correct because it's on here. After I got to the job that's when I would notice that something would be different." He went on to state that "I'd notice right away, after I got to the site, that there's more than 167,000 square feet" in the 500 area. He also testified: "Well if you went out to the grounds, if I went out to the grounds, I would notice that there's more than four acres there. Certain parcel numbers are larger than four acres on their own." Further, Mr. Shubin stated that the nature of the terrain would have no impact on his ability to view the site and identify what portions of the base were 500 areas that demanded upkeep. It is undisputed that although the terrain was hilly, it was all upslope. In Mr. Shubin's words, "square feet is square feet", no matter if the land is flat or goes straight up. He also testified that he would have no difficulty in reading the drawings and legend so as to identify what areas required maintenance. Additionally, he stated that, if he bid on the same contract, he probably would have requested a clarification.

Conceivably, there could be bias on the part of Mr. Shubin. He is the current grounds maintenance contractor at the hospital and, hence, theoretically has motive to attempt to please NAVFAC with his testimony. Similarly, though, Mr. Herman could be biased in that he might be inclined to bring forth any explanation he felt sufficient to justify plaintiff's position at trial. This court finds that no bias existed on the part of either witness. Both witnesses' testimony was spontaneous and trustworthy, with no indications of bias present. Weighing the witnesses' testimony, this court finds Mr. Shubin's more credible and

reliable regarding the patency of the ambiguity. Mr. Shubin's testimony supports a finding that the correct size of the 500 area was discernable from a site visit of the base and therefore charges Mr. Herman, after having conducted such an inspection, with the knowledge it should have brought. *Leal v. United States*, 149 Ct.Cl. 451, 460, 276 F.2d 378, 383 (1960) (where a contractor "knew or should have known" that reality differed from information in government-prepared plans or specifications, "then it cannot be said that he was misled," even if the Government withheld information); *accord Wickham*, 212 Ct.Cl. at 324, 546 F.2d at 398.

Further, plaintiff did verify its bid. This act must have some meaning. At the bid verification meeting, plaintiff, through Joel Herman, stated that plaintiff's bid was firm, that the required work was understood, and that the contractor would make a profit on the contract. Notice of this meeting alerted the contractor that NAVFAC believed there was a possible error in its bid. Bradley Herman consequently had reason to question all portions of plaintiff's bid. Instead of conducting a detailed bid analysis, Mr. Herman simply chose to look over the bid and check his calculations for errors. He did not return to the hospital grounds, nor did he make any inquiries whatsoever of any NAVFAC contracting personnel. Mr. Herman had opportunities to learn of the error in square footage of the 500 area but failed to make effective use of them.

The bid verification process serves to provide assurances to the Government that it will receive precisely what it contracted for: the work done for the price quoted, within the time specified. Policy considerations compel this court to bind plaintiff to the assurances it made at the verification meeting. To hold otherwise would severely undermine the objectives of the verification process by removing the certainty inherent in the process; by dissuading the Government from relying on the contractor's word; and by diminishing any incentive the contractor has to make a good faith, complete review of its bid.

## 2. *Latent ambiguity and reliance*

Assuming that the ambiguity in the size of the 500 area is latent rather than patent, the issue then becomes whether plaintiff actually relied on the ambiguity. Generally, " 'where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid.' " *Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1430 (Fed. Cir.1990) (quoting *Lear Siegler Management Servs. Corp. v. United States*, 867 F.2d 600, 603 (Fed.Cir.1989)). The contractor thus bears the burden of proving reliance on the alleged interpretation. Further, the alleged reliance must not be a mere afterthought, since it is necessary that " 'the contractor *actually* and *reasonably* (emphasis in original) relied upon that interpretation *when it entered into the contract.* (emphasis added).' " *Id.* at 431 (quoting *Randolph Eng'g Co. v. United States*, 176 Ct.Cl. 872, 880, 367 F.2d 425, 429–30 (1966)).

Introduced into evidence was the sheet of paper containing Bradley Herman's notes concerning required work hours on the 500 area. These notes were taken during his unaccompanied site visit. Mr. Herman arrived at a figure of 20.1 "man/months." Since one man/month contains roughly 160 man-hours per month, there are 3,216 total man-hours within 20.1 man/months. Mr. Herman included this figure in his original bid calculation, but then felt that his man/month predictions for the total contract might be a little too low. As a correction, he added three man/months to his overall bid.

The number of man-hours actually experienced on the 500 area was 4,418, which is 1,202 hours, or 37.4 percent, more than estimated in Mr. Herman's notes. Plaintiff would have this court believe that, while 3,216 hours were allotted originally to the 500 area in the belief that the area consisted of only 167,000 square feet, only 1,202 additional hours were needed to complete the work on the actual 1,719,000 square feet. If, as plaintiff contends, it did rely

upon the legend, the court would expect to see a much more pronounced disparity between the hours bid and the hours worked. This minimal difference is an indication that Bradley Herman did not rely on the inaccurate square footage in the legend at the time he prepared plaintiff's bid.

Additionally, defense witness Mrs. Ward, NAVFAC's contract specialist in charge of administrating plaintiff's contract, testified as to plaintiff's bid price per square foot in relation to its other bids on what she considered to be similar contracts. Using the erroneous total square footage of 1,294,-000, she divided the bid price of $152,400.00 by the square footage and arrived at a figure of $0.1178, which represents the contractor's bid price per square foot if it used the incorrect square footage. In three other roughly similar contracts, plaintiff's bid price per square foot was much lower, ranging from $0.0389 to $0.0657. As a "rule of thumb," Mrs. Ward testified that grounds maintenance contracts cost the Government an average of $.05 per square foot. Using the correct square footage for the Oak Knoll contract, Ms. Ward arrived at a per square foot figure of $0.0589. This number is in error. After dividing $152,400.00 by the correct square footage of 3,013,000, plaintiff's bid price per square foot equals $0.0506, a number well within the range of the contractor's other bids. Recognizing that no two contracts are ever exactly alike, this comparison does not attempt to illustrate a strict scale within which plaintiff's bids must fall. Rather, it tends to show the large discrepancy between plaintiff's supposed bid rate for this contract and its confirmed bid rate on similar contracts. If plaintiff did rely on the ambiguity in the legend, there would likely be no great disparity between its bid price per square foot in the current contract *vis-a-vis* the similar contracts.

Further, the contractor's claimed damages for the first year of the contract are $81,468.05, and its schedule of deductions estimate of the cost of the original contract work was $65,592.00. To accept that plaintiff relied on the legend in making its bid, the court would have to conclude that even though the total size of the 500 area increased by a factor of 11.29, or 1,129 percent, plaintiff's costs increased by only a factor of 1.24, or 124 percent, over its schedule of deductions estimate. If actual reliance on the legend existed, damages would be expected to bear some proportionate relationship to the larger area. Any logical correlation between increased costs and increased area size is not apparent.

Bradley Herman did testify that, if he had known the correct square footage, he would have bid the contract differently by increasing the bid price by $120,000.00 Regarding costs, Mr. Herman stated that there would be no direct relationship between increased size and increased costs, because, first, more full-time workers would have been assigned to the contract and, second, increased efficiencies would have led to a lower price per square foot. Further, he explained that after the last option for plaintiff's contract period expired, he bid for the new contract, with full knowledge of the correct size, at a price of $325,000.00. Plaintiff's point about gaining labor efficiencies is plausible, but it does not account for the discrepancy. In the admittedly labor-intensive 500 areas, requiring mostly handwork, plaintiff only increased by 37 percent its man-hours in order to service eleven times the acreage on which it previously bid. Plaintiff did not offer a plausible explanation for attaining labor efficiencies of the magnitude to result in not even doubling the man-hours required to perform the alleged extra work.

As the Federal Circuit stated in *Fruin-Colnon*, plaintiff must prove reliance on the alleged misrepresentation, and this reliance must occur at the time plaintiff submitted its bid. To establish reliance, plaintiff must proffer probative evidence that is sufficient to discharge its burden of proof. Here, plaintiff's proof of reliance consisted solely of Bradley Herman's statements that he relied on the legend, his statements concerning increased efficiency, and on his "4 [acre]" annotation next to the 500 area on the legend. Absent a reasonable correlation between the dollar amount produced by his method of bidding—relying on the inaccurate information—and the dollar

amount now claimed, such evidence is not probative. Therefore, even assuming the legend was latently ambiguous, plaintiff's claim fails due to lack of reliance.

### 3. *Damages*

 Mrs. Ward made a government estimate of the contractor's actual incurred costs. She based the estimate on an audit by the Defense Contract Audit Agency, Los Angeles Branch ("DCAA"). The DCAA conducted the audit in response to plaintiff's request for an equitable adjustment of the contract price.

In large part the contractor's payroll records constituted the basis for this government estimate. Mrs. Ward was the only witness who verified these records. She computed this estimate of plaintiff's actual incurred expenses by, first, recalculating plaintiff's payroll cost. To do this, Mrs. Ward used the hourly rate recommended in the audit for both laborers and operators. The audit disallowed, among other costs, $0.96 an hour for the laborers and $1.13 an hour for the operators. These numbers related to the contractor's payment of workers' compensation insurance and, from the auditor's point of view, were expenses which the contractor failed to justify adequately. Using these adjusted figures, Mrs. Ward calculated laborer costs by multiplying 4,255 hours times $12.37 per hour to yield a total of $52,634.35. Next, she computed operator costs by multiplying 2,054 hours times $14.42 per hour for a total of $29,618.68. These two totals, combined together, add up to an adjusted contract payroll cost of $82,253.03. Mrs. Ward determined the contractor's indirect costs by multiplying this last figure by 0.524 and reached a total of $43,100.59.[8] Then Mrs. Ward computed the contractor's overhead by multiplying $82,253.03 times a factor of 0.15, for a total of $12,337.95. She added the figures for payroll, indirect costs, and overhead and arrived at $137,-691.57 as NAVFAC's estimate of plaintiff's actual incurred costs.

This court disagrees with the DCAA's assessment that the workers' compensation costs were not proven by plaintiff, because plaintiff did introduce a letter from the insurer to Bradley Herman confirming the workers' compensation rate. It is sufficient to overcome the DCAA's misgivings. Therefore, Mrs. Ward's figures require recalculation.

After adding back in the disallowed portions of the hourly labor rate, plaintiff spent $56,719.15 on laborers and $31,939.70 for operators during the contract's first year. Additionally, plaintiff's indirect costs, using its figure of 0.70, are $62,-061.20 and its overhead is $13,298.83. Adding these figures together, the corrected Government estimate of the contractor's actual incurred expenses equals $164,-018.88. This figure is $11,618.88, or roughly 7.6 percent, in excess of its original bid price of $152,400.00.

Defendant asserts that plaintiff's proof of damages relies on the disfavored total cost method of accounting.[9] Defendant is correct in that " '[t]he total cost theory of recovery was not favored by the United States Court of Claims and was tolerated only when no other mode of recovery was available, and when the reliability of the supporting evidence was fully substantiated....' " *Skip Kirchdorfer, Inc. v. United States,* 14 Cl.Ct. 594, 605 (1988) (quoting *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 676 (1984)). Further, in reference to cases allowing a modified total cost approach, the Court of Claims stated:

> [T]he total cost computation was used as "only a starting point," with such adjustments thereafter made in such computation as allowances for various factors as to convince the court that the ultimate, reduced, figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint....

---

**8.** This 0.524 figure was recommended in the audit. The contractor, however, used 0.70 in its calculation of indirect cost.

**9.** For a full discussion of the total cost method of accounting, *see Skip Kirchdorfer, Inc. v. United States,* 14 Cl.Ct. 594, 605–07 (1988).

14 Cl.Ct. at 605–06 (quoting *Boyajian v. United States*, 191 Ct.Cl. 233, 247, 423 F.2d 1231, 1240 (1970) (citation omitted)).

Plaintiff successfully avoided thwarting the above rules, however, as it did not rely on the total cost method. Plaintiff introduced into evidence a December 23, 1986 letter to NAVFAC, with several attachments appended. These attachments contained its Project Manager's detailed report of man-hours for each job and each parcel, as well as a cost sheet for each work item as listed in the schedule of deductions. Bradley Herman was able to explain satisfactorily how these schedule of deduction estimates were translated into actual labor and indirect cost figures for the 500 areas. Thus, the contractor did not use the total cost method.

Plaintiff attempted to prove its damages for the option periods by using the damages that it allegedly suffered in the first contract year to project a corresponding damage figure into the subsequent option periods. The contractor introduced no cost sheets or payroll records, or any other type of evidence, concerning its actual hours worked during the contract's final year and one half. Plaintiff's projection is inadequate to meet the requirement that the contractor prove the amount of loss with sufficient certainty so that damages will not be speculative. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987). Inarguably, plaintiff's Project Manager could have prepared cost sheets for these periods, but plaintiff did not proffer them. Bradley Herman was not in a position to testify that the identical hours were expended. In these circumstances plaintiff provided no basis for projecting its first year costs and expenses. On defendant's motion pursuant to RUSCC 41(b), the claims for option periods were dismissed at the close of plaintiff's evidence.

10. The other theories for relief in plaintiff's complaint have been abandoned. They were not advanced by plaintiff in its Memorandum of Contentions of Fact and Law filed before the pretrial conference, plaintiff arguing only that the legal issues were whether the contract was ambiguous and whether plaintiff reasonably relied on NAVFAC's estimate. Pursuant to

## CONCLUSION

Based on the foregoing, this court concludes that the ambiguity in the drawings was patent. Even if no patent ambiguity was present, plaintiff failed to prove reliance on a latent ambiguity. Accordingly, judgment shall enter for defendant, and the Clerk of the Court shall dismiss plaintiff's complaint.[10]

IT IS SO ORDERED.

No costs.

RUSCC Appendix G, ¶ 15, the parties' Joint Statement of Issues of Fact and Issues of Law determines the parameters of admissible evidence. The joint statement identified factual issues relating only to the legal issue of patent ambiguity and reasonable reliance. No evidence was introduced relevant to any other legal issues raised in plaintiff's complaint.